637 So.2d 1012 (1994)
STATE of Louisiana
v.
Percy DAVIS.
No. 92-KA-1623.
Supreme Court of Louisiana.
May 23, 1994.
Rehearing Denied June 24, 1994.
*1016 John M. Lawrence, Alan J. Golden, for applicant.
Richard P. Ieyoub, Atty. Gen., Paul Carmouche, Dist. Atty., Hugo A. Holland, Jr., Catherine M. Estopinal, for respondent.
MARVIN, Justice Ad Hoc.[1]
In this appeal of his conviction of two counts of first degree murder and his sentence to the death penalty under each count, Percy Davis makes 35 assignments of error. We consider all assignments and affirm.

PREFACE
Each murder occurred during an armed robbery committed during the consecutive nights of June 29-30, 1990, at convenience stores in Shreveport. The proof of the murder, committed about 2 a.m. on June 29, of Mark Sanchez, an employee of a Circle K store, was based on circumstantial evidence. Proof of the second murder, committed around midnight on June 30 of Calvin Moore, owner of an Exxon outlet (Fat's Exxon), was based on direct evidence that included the testimony of Moore's wife, Norma, at whom Davis also shot, and a video tape filmed by a video camera in the store that showed Davis shooting Mr. Moore and shooting at Moore's wife and committing the robbery. The video tape was seen by the jury during both the guilt and sentencing phases of the trial. Ballistics showed both murders were committed with a pistol Percy Davis had acquired on June 22. Davis told police that he never loaned his pistol to anyone and had effective control or possession of the pistol during the time surrounding both murders. Davis admitted robbing and shooting Moore, but not Sanchez.
With the required capital sentence review in the published portion of this opinion, we shall review the assignments relating to trying the two murder counts in one trial and those that relate to the admissibility, comparative quality, and the legal sufficiency of the evidence to convict and to support the capital penalty for each count.
In an unpublished appendix and as in every capital case, we shall review the record for all other possible error and shall consider all remaining assignments, which, in our opinion, do not merit publication because they are readily resolved by established legal principles. State v. Code, 627 So.2d 1373 (La.1993).

FACTS
On June 22, 1990, the 25 year old defendant, Percy Davis, bought from a Shreveport pawn shop a .25 automatic pistol. He made the purchase with a credit card of another person. Davis claimed he "found" the card. The next day Davis used his pistol to commit an armed robbery of Mark Lavigne, an employee of a convenience store in Bossier City, hitting him on the head with the pistol and causing it to discharge. Ballistics tests showed Davis's pistol was used in that and other armed robberies, including the two that resulted in two murders that are here appealed.[2]

*1017 THE SANCHEZ MURDER ON JUNE 29, 1990
On June 29, 1990, Percy Davis and a neighborhood acquaintance, Jerome Mitchell, as a passenger, in Davis's distinctive automobile, a Datsun 280 ZX with "Percy" written on each door and on the front license plate, "cruised" after midnight in Shreveport. During this time they bought and drank beer and Davis smoked cocaine that he had purchased, according to Mitchell.
Before reaching the Circle K store where Sanchez was employed, Davis told Mitchell he needed some money. There, Davis removed and left in his car with Mitchell, distinctive jewelry he was wearing. Davis took his .25 pistol from the glove compartment of his car, telling Mitchell to wait for him. Davis departed the car to enter the store with the pistol tucked in the back of his trousers. Mitchell saw Davis walk toward the store and, after a brief delay, saw him return from the store to the car. Entering the car, Davis removed the pistol from the front of his trousers and returned it to the glove compartment. Once in the car, Davis displayed to Mitchell money Mitchell said Davis did not have before he entered the store, some of which thereafter was spent by Davis to purchase more crack cocaine before he drove to Mitchell's home, where Mitchell departed.
While the armed robbery and murder of Sanchez was occurring, another employee of the Circle K store, Patricia Williams, drove and parked her car near the store, intending to deliver some store keys to Sanchez. From a distance, she saw a black male in his mid-20's, whom she could not otherwise then or later identify, holding a pistol and opening and looting the cash register. She quickly drove away to report the incident to police at 2:00 a.m., who immediately responded. Police found Sanchez suffering three gunshot wounds, one of which was between his eyes. Sanchez died shortly after reaching the hospital
Ballistics tests showed that Davis's pistol fired the fatal shots. Davis was arrested after the Moore murder which occurred about midnight on the day after Sanchez's murder. Davis told police he had the pistol under his control or possession during the time surrounding both murders and that he had not loaned his pistol or his automobile to anyone during that time.

THE MOORE MURDER THE NEXT NIGHT
At about 3 a.m. on June 29, Johnny Hall, an employee of Fat's Exxon, an outlet or convenience store owned by Calvin Moore located in the same neighborhood as the Circle K store where Sanchez was murdered, became another victim of Percy Davis. There Davis robbed and shot Johnny Hall. Ballistics showed that the cartridge from which the shot was fired came from Davis's pistol. During the penalty phase of the murder trial, Johnny Hall identified Davis as his robber and assailant.
Near midnight on June 30 Davis returned to Fat's Exxon where he committed the armed robbery and murder of Calvin Moore some 20 hours after he had robbed and shot Johnny Hall in the same store. Moore and his wife were working that night because Hall was hospitalized. The video tape of the murder-robbery clearly shows those persons who were at the counter and cash register being served by Calvin Moore and his wife.
Davis was accompanied by an acquaintance, Rodney Hill. When Davis and Hill appear on camera, Hill stands at the counter while Moore places small items in a paper sack. Davis walks past the counter toward the rear of the store and quickly returns to the counter while Moore's attention is directed to placing small items in the sack. Davis quickly bends or stoops below the counter and pulls his pistol from his sock. Arising from that position with pistol in hand, Davis, in one quick and continuous motion, without saying anything to Moore, shoots Moore in the chest at point blank range. Davis's acquaintance, Rodney Hill, departs from camera range about the time Davis draws his pistol and shoots Calvin Moore. Moore obviously does not notice or react to the pistol, but is thrown on his back by the gunshot and is twitching, breathing heavily and immediately on the floor in the throes of death.
*1018 Immediately after shooting Moore, Davis shoots at Mrs. Moore who is 8-10 feet away to Davis's left and also behind the counter at which her husband stood. Fortunately, Davis missed Mrs. Moore. She immediately reacts, falling to the floor and quickly scoots under the counter.
Davis thereafter opens and ransacks the cash register, removing all currency, some of which was in an envelope, and some coins, while observing his wounded victim on the floor in the throes of death. While removing the money from the cash register, Davis keeps the pistol pointed at Moore and threatens to shoot him again if he attempts to get up. Mrs. Moore testified that she heard Davis say to her husband, "Are you trying to get up from there? I'll shoot you again, you m___ f___!" Lip reading the videotape corroborates what Mrs. Moore said Davis said.
After removing the money Davis departs toward the front door of the store and out of the range of the camera. Shortly after Davis departs, Mrs. Moore rises from under the cabinet and comes to the aid of her husband, telephoning for help. She is soon assisted by a customer who enters the store and by Thomas Adgate, who had been an earlier customer.
Shortly before the murder-robbery of Calvin Moore, Adgate had purchased gas from Moore. As Adgate was leaving the outlet, he saw Davis and Hill walking from Davis's car which he noticed was parked in the wrong direction on a street behind the back lot of the outlet. He watched the two walk along the side of the building toward the entrance. These circumstances aroused Adgate's suspicion as he drove away from the outlet, causing him to reverse his direction, driving around the block and back to Fat's Exxon.
Returning, Adgate first noticed there was no one behind the counter. He then saw Davis, holding "something" (perhaps the envelope) in his hand, appear along the side of the building running toward the wrongly parked car that had first aroused Adgate's suspicion. Adgate then entered the store where he saw the results of the murder-robbery, Mr. and Mrs. Moore in the circumstances above described.
In response to the telephone calls, police arrived and learned that the video camera in the store was functioning before, during and after the robbery-murder. Police provided a copy of the videotape to news media, requesting help. Shreveport television stations played the tape on several occasions during the hours that followed. Davis and Hill, of course, were recognized by acquaintances who viewed the telecasts. Once Hill was told about the videotape he voluntarily went to the police, attempting to exculpate himself as much as possible, while identifying Davis as the perpetrator of the crimes. Davis's picture was placed in a photographic lineup which was separately presented to Adgate and Hill. Each identified Davis's photograph. Adgate also identified Davis in a live lineup after Davis was arrested and again at the trial. Police began to search for Percy Davis and his distinctive car after he was identified by Hill.

DAVIS'S ARREST
An affidavit was signed and a warrant was prepared for Davis's arrest to be presented to a district judge for signature. Before the warrant was signed, Davis, with his cousin, Marlin Rogers, as his passenger, drove his distinctive car into the driveway of the home of their grandmother where police, who had been following them, immediately converged on them. When Davis recognized he was being followed, he took his pistol out of the glove compartment of his car, giving it to his cousin, telling him to hide it and saying, "I think I'm gone."
Both Rogers and Davis exited the car in their grandmother's driveway on police orders. Both were immediately frisked and patted down. Rogers had attempted to hide the pistol in his underwear and had placed a box of bullets for the pistol in his pants. During the pat down the pistol fell to the ground and the box of bullets was discovered.
Davis was advised of his Miranda rights several times and thereafter signed a printed waiver of those rights at the police station. Being questioned about the period of time encompassing both murders (Sanchez on June 29 and Moore on June 30) and about *1019 who had possessed his pistol and distinctive car, Davis told police that at all times he possessed or effectively had custody and control of the pistol and the car and had not loaned either to anyone. Davis admitted robbing and shooting Calvin Moore, but denied robbing and shooting Sanchez and Hall. Davis knew of the telecasts of the murder-robbery of Moore before he was arrested.
The jury rejected Davis's intoxication defense in each murder and his efforts to impeach the State's witnesses. The jury, in separate verdicts, found each murder was committed during the commission of an armed robbery. In the Sanchez murder, the jury found, as an additional aggravating circumstance, that the murder was committed in an especially heinous, atrocious or cruel manner, obviously because Sanchez was shot three times, once between the eyes at close range, and twice in the abdomen, according to the coroner. The trial court's instruction included this aggravating circumstance, but the state did not argue or urge that the jury should or could find it.

THE ASSIGNMENTS
No. 5Severance: Davis does not dispute that the two murders could be tried together on the authority of La.C.Cr.P. Art. 493. Instead, he contends, on the authority of La. C.Cr.P. Art. 495.1, that he was unfairly prejudiced by the trial court's denying his motion to sever the trial of the two crimes.
Davis was placed by one or more witnesses at each convenience store when each murder was committed. Each murder was committed with Davis's pistol late at night in the same general area of Shreveport. Both occurred during an armed robbery. The trial court reasoned that a jury could differentiate between the evidence in each case without confusion of defenses as to the quality and legal sufficiency of the evidence and without undue prejudice, because each murder occurred on a different night at a different store with different supporting witnesses and evidence.
The jury's return of differing aggravating circumstances on the verdict in each case strongly indicates that the jury did in fact differentiate and separately consider the evidence in each case. The jury was obviously impressed that Davis shot Sanchez three times, once between the eyes, while firing only one shot each at Mr. Moore and Mrs. Moore.
A defendant in any case bears a heavy burden of proof when alleging prejudicial joinder of offenses as grounds for a motion to sever. State v. Washington, 386 So.2d 1368 (La.1980). Factual, rather than conclusory, allegations are required. Evidence of a crime other than the one charged, which may not, for some reason, be admissible under Prieur[3] in a separate trial of that charge, does not prevent the joinder and single trial of the charge of both crimes, if the joinder of both crimes is otherwise permissible. State v. Celestine, 452 So.2d 676 (1984).
Patricia Williams and Jerome Mitchell, the primary witnesses in the Sanchez murder, were two of the first witnesses presented. The videotape, Mrs. Moore, and Thomas Adgate were the primary witnesses in the Moore murder. Davis's cousin, Marlin Rogers, was a state's witness. Some police and expert witnesses testified, of course, about their investigation and findings in each case. Davis clearly admitted the Moore robbery and shooting but categorically denied the Sanchez robbery and shooting.
We conclude the evidence of each murder was "compartmentalized" and not confused. The jury was instructed that it should consider the evidence in each case and "need not return the same verdict as to each count" and that a separate verdict in each case was required. Defense counsel emphasized this in his argument to the jury.
On this record, we cannot conclude that severance was required or that Davis was unfairly convicted of the Sanchez murder by being unduly prejudiced by the evidence of the Moore murder. Davis's assignment five has no merit.

*1020 SUFFICIENCY OF EVIDENCE
Nos. 33, 34Davis contends that the State's evidence of the Sanchez murder does not exclude every reasonable hypothesis of innocence because both Patricia Williams and Jerome Mitchell were impeached and the first police officer at the Sanchez scene testified that a "vagrant" told him that he had seen four persons leave the scene in a beige Chevrolet under "suspicious" circumstances. The vagrant was not available to testify and his whereabouts were apparently unknown to the defense and the State.
Notwithstanding that Mitchell admitted having criminal convictions and lying about some things to the police in his initial statements, the jury could have believed Mitchell's testimony under oath about what Davis said and did while Mitchell was with Davis on the night of the Sanchez murder.
Similarly, the jury could have believed Ms. Williams's testimony that she saw only one black male robber in his mid-20's in the Circle K store, notwithstanding that a security guard for the store testified that she had told him there were two robbers.
The jury knew nothing about the vagrant other than he identified himself as a vagrant who gave a name and made a statement that the police officer included in his written report. The jury could have discounted and given little relevance or credence to what the vagrant said to the police officer.
The jury also could have rejected testimony, suggestion and argument that Davis was so drugged or intoxicated that he could not form the requisite specific intent to kill. La.R.S. 14:15(2). The jury is the ultimate factfinder of whether a defendant proved his condition and whether the State negated that defense beyond a reasonable doubt. As a reviewing court, we do not impinge on the jury's factfinding prerogative in a criminal case except to the extent necessary to guarantee constitutional due process. State v. McKeever, 407 So.2d 662, 665 (La.1981).
The ballistics evidence that Davis's pistol fired the fatal shots into Sanchez was uncontradicted. Davis told police that the pistol was under his control or possession during the time surrounding Sanchez's murder and that he had not loaned either his car or his pistol to anyone during that time. Mitchell testified what Davis said and did, when and where, with respect to the Circle K store, the pistol and the money that Davis first said he "needed" and thereafter displayed to Mitchell. The ballistics evidence corroborated Mitchell's statement about Davis and Davis's pistol being at the store at the time the Sanchez robbery-murder occurred. Ms. Williams, who saw a black male with a pistol in his hand robbing the Circle K cash register, reported this to police about 2 a.m.
In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). La.R.S. 15:438; State v. Captville, 448 So.2d 676, 678 (La.1984); State v. Rosiere, 488 So.2d 965 (La.1986). Other than this case being a capital case, the circumstances of Sanchez's murder does not present unusual coincidences and lack of corroboration that demand our particular close scrutiny on review. State v. Mussall, 523 So.2d 1305 (La. 1988). Compare State v. Shapiro, 431 So.2d 372 (La.1982), on rehearing.
The evidence of the events surrounding Davis and his victim on June 29, 1990, was legally sufficient to convict Davis of the robbery-murder of Sanchez beyond a reasonable doubt, independent of the evidence regarding the murder of Calvin Moore on June 30, 1990.
The Moore murder is dramatic. Davis admitted shooting and robbing Calvin Moore. The videotape clearly depicts this. The jury could have concluded beyond a reasonable doubt that Davis specifically intended to kill Moore because of the close range of the shot, his shooting at Mrs. Moore, and his *1021 threat thereafter to again shoot Moore. La. R.S. 14:30(A)(1).
The evidence in each instance also proved beyond a reasonable doubt that both murders (Sanchez and Moore) occurred during the perpetration of the armed robbery as defined by La.R.S. 14:64(A), the "taking of anything of value belonging to another ... that is in the immediate control of another, by use of force ... while armed with a dangerous weapon." Compare State v. Refuge, 300 So.2d 489 (La.1974).
At this juncture we shall also resolve in part Davis's collateral complaint in this assignment that is a part of the complaint in Assignment No. 30 about what the state is required to prove during the sentencing phase of a capital case. Davis's collateral complaint is that the jury erred in finding that the Sanchez murder was committed in an especially heinous, atrocious or cruel manner. A capital sentence supported by one statutory aggravating circumstance is not required to be reversed because another aggravating circumstance is not supported. Compare State ex rel. Busby v. Butler, 538 So.2d 164 (La.1988); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); and State v. Jones, 474 So.2d 919 (La.1985).
Davis shot Sanchez three times, once between the eyes, and twice in the abdomen. Dr. McCormick, forensic pathologist and coroner, testified that while the first wound to the abdomen was superficial, the second wound to the abdomen could have been fatal, and the wound to the head was definitely fatal. The jury was obviously impressed with the shot to the head. We assume, but do not find, however, that the only aggravating factor that is supported is that the murder occurred during the perpetration of an armed robbery, and on the authorities cited above, we do not negate the sentence.
No. 2Search Warrants: Davis attacks the validity of three search warrants for the search of his residence, his girlfriend's residence, and his impounded vehicle after his arrest. The warrants were supported by the same affidavit. Davis characterizes the issue before this court as to what extent a single affidavit can be used to support multiple warrants.
Davis claims that the affidavits supporting the search of residences at 1859 Jackie Robinson and 1914 Jackie Robinson did not state that the unspecified items to be seized had been observed. He argues that the affidavit was deficient because it did not establish a fair probability that any items relating to the murders would be at his girlfriend's residence and do not even state when Davis had last been at his girlfriend's apartment.
Countering that the items seized pursuant to warrants from his car and his grandmother's and girlfriend's residences, mainly clothing, were not introduced at trial, the State asserts Davis's motions to suppress became moot. The record supports the State's contention. The items were not introduced at trial. Davis cannot claim he suffered any prejudice from the trial court's ruling about the validity of the search warrants. The correctness of the denial of a motion to suppress is generally moot if the State does not introduce the evidence at trial. State v. Smith, 339 So.2d 829 (La.1976). Nonetheless and because this is a capital case, we shall address Davis's complaints.
In the single affidavit the affiant, Detective Richard Childers, recounted the facts of the Moore robbery and shooting. He noted that after the video appeared on television, Rodney Hill came to the police and informed them that Percy Davis was the shooter in the video. The affidavit also stated that a witness identified Davis's car as a 1980 Datsun 280 ZX with "Percy" written on the sides and front and identified a photograph of Davis. The affidavit specified the items to be searched as a faded maroon-colored pullover shirt, dark colored sweatpants, white high-top tennis shoes, United States currency and coins, a .25 caliber handgun and ammunition, and a white envelope, which contained currency that was taken during the Moore murder. The clothing described in the affidavit was worn by Davis during the robbery. The videotape, Ms. Moore, and Hill established these circumstances to the affiant.
*1022 The affidavit recites that Davis was arrested in the driveway of 1859 Jackie Robinson and that he implicated himself in the Moore murder. The affidavit recites that the passenger, Marlin Rogers, having been arrested, informed police that the pistol belonged to Davis. Rogers told the police he lives with Davis at 1859 Jackie Robinson and that Davis's girlfriend was Vanessa Ferguson. The affidavit states that Rogers stated that Davis spends most nights at Vanessa's apartment, located at 1914 Jackie Robinson, and keeps clothing at that location.
Probable cause exists when the facts and circumstances within the affiant's knowledge and of which he has trustworthy information, are sufficient to support a reasonable belief that an offense has been committed or that contraband may be at the place to be searched. State v. Byrd, 568 So.2d 554 (La.1990); State v. Johnson, 408 So.2d 1280 (La.1982). An issuing magistrate must make a practical common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. The task of the reviewing court is simply to insure that the magistrate had a substantial basis for concluding that probable cause for a search warrant existed. State v. Lingle, 436 So.2d 456 (La.1983).
We conclude information in the affidavit provided the magistrate with a substantial basis for authorizing each search warrant. This court noted in State v. Poree, 406 So.2d 546, 547 (La.1981),
Without direct observation, the appropriate connection [between the sought-after items and the place to be searched] may be manifested by the type of crime, the nature of the items sought, the extent of opportunity for concealment, and normal inferences as to where a criminal would be likely to hide the instrumentalities and fruits of the crime. [citation omitted].
Here, the magistrate could reasonably conclude that Davis would likely store his clothing he wore during the crime and the fruits and instrumentalities of the crime in either his car, his own residence, or his girlfriend's residence. In these circumstances, the one affidavit was legally sufficient for each search warrant.
No. 3In this assignment, Davis contends that Thomas Adgate's identification of him as the man he saw at Fat's Exxon should have been suppressed. Adgate testified that he was driving away from the store when he noticed Davis's parked car and Davis, accompanied by another black male, approaching the store. This suspicious circumstance caused Adgate to circle the block and return to the store. Adgate then saw Davis running from the store and, although 50-60 feet away, Adgate claimed to get a good look at Davis outside the well-lighted store. Adgate described Davis correctly as a tall and slender black male. Later the same day Adgate identified Davis in both a photographic and a live line-up.
Davis contests Adgate's identifying him at trial, over a year and a half later, as the man he saw running from the store on the night of the murder. Davis claims Adgate's identification was tainted because before trial Adgate had viewed the two line-ups and a videotape of the murder and had a fixed image of Davis's face. He contends Adgate lacked an independent source for his identification and was able to identify him at trial primarily because his face was shown to him several times in the time between the murder and trial.
Despite the existence of a suggestive pretrial identification, an in-court identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977). When a suggestive identification procedure is asserted, courts must look to several factors to determine, from the totality of the circumstances, whether a substantial likelihood of misidentification existed. The factors include: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. See also Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 *1023 (1972); State v. Martin, 595 So.2d 592, 595 (La.1992). Against these factors must be weighed "the corrupting effect of the suggestive identification itself." Manson v. Brathwaite, supra; State v. Martin, supra, State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Winn, 412 So.2d 1337 (La.1982).
Adgate's attention was fixed on the two black males because of the suspicious circumstances that caused Adgate to return to the store. Adgate's clothing descriptions closely matched what the two men were wearing and his description of their respective build was accurate. Further, Adgate was confident of his view of Davis and his lineup identifications that were made within one day of the offense. Moreover, we see no likelihood of misidentification, considering that Davis confessed to shooting and robbing Calvin Moore at Fat's Exxon and the offense was filmed by video camera.
The trial court denied the three motions to suppress (physical evidence, identification, and statement) at one time. The court concluded the police acted properly and did not present suggestive line-ups. The court found an independent basis for Adgate's identifications.
We find the ruling of the trial court was clearly correct. This assignment lacks merit.
Nos. 4 and 27Defendant first argues that his statements given to the police at the Shreveport Police Station immediately after his arrest should have been suppressed. Davis acknowledges he was advised of his Miranda rights and signed a card containing Miranda warnings before giving statements to the police around 11:00 p.m. soon after his arrest. Because Davis informed the officers that he had smoked three or four rocks of cocaine the night before and drank three or four beers earlier during the day of his arrest, the officers carefully determined that Davis was oriented, alert and coherent. Davis, of course, claims the inculpatory statements were made under the influence of duress, alcohol, and cocaine. He argues the tape recorded statement, along with the typed transcript, should not have been admitted at trial. Davis agrees that the detective asked him several questions to test his presence of mind, but asserts this shows the detective doubted he was oriented. Although Davis told the officers he was "straight," he claims the State did not meet its burden.
Davis incidentally claims duress and fear produced the statements because he was arrested by a multitude of policemen in a highly intimidating manner where they subdued him at gunpoint. This claim is not substantiated by the record. The first two detectives who began questioning him around 11 p.m. noted that he appeared nervous. Davis claims that because of duress, drugs, and alcohol, his understanding of what he was doing was negated. Davis claims that the officer's testimony that he seemed coherent and appeared normal, does not show that Davis fully understood what he was doing.
The police officers said Davis did not appear intoxicated on drugs or alcohol when he was arrested and then questioned. Because of Davis's claim of drug use, Detective Fogger inquired into Davis's mental condition. Davis appeared coherent, even telling the officers he was straight. As to the duress claim, the officers negated any suggestion of threats or physical harm, testifying that Davis did not resist, but was arrested without incident. During the ride to the police station one officer sat in the back seat with Davis because Davis appeared very upset. He even held the officer's hand and put his head on the officer's shoulder. Davis could not have been too intoxicated because he told Rogers, "I think I'm gone" and got him to conceal the murder weapon. Davis's asserted nervousness or alleged intoxication leading to the confession could have resulted from Davis's admitted knowledge that the video of his robbery-murder had been broadcast on every local news program that day in Shreveport. Although Davis said he blacked out and did not know whether he hit anyone when he fired the gun, he did not deny what the video tape clearly showed.
Davis's statement shows that it was taken on July 1, 1990, at 11:38 p.m. He was advised of his rights and knowingly waived *1024 them. Before his statements, Davis signed and initialled a waiver of rights cards.
The trial court found Davis was advised of his Miranda rights three or four times. The court was convinced the evidence clearly showed there was no influence of fear, duress, or promises and that Davis's statement was given freely and voluntarily. The court found Davis was not under the influence of alcohol or cocaine when he confessed to the Moore offense. The court noted Davis's use of cocaine occurred at least 24 hours before the confession and that Davis knew what he was saying on the tape, giving a detailed description of the Moore armed robbery and explicitly recounting the route by which he drove to his home from Fat's Exxon after the robbery-murder.
Before a confession may be introduced into evidence, the State must affirmatively show that it was free and voluntary, and not the result of fear, duress, intimidation, menace, threats, inducements or promises. State v. Simmons, 443 So.2d 512 (La.1983). The State must also establish that an accused was advised of his constitutional rights, state and federal, and that he understood and knowingly waived those rights. State v. Simmons, supra. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before questioning a suspect in custody, Miranda requires that law enforcement officials inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one would be appointed for him.
Whenever a defendant alleges police misconduct in eliciting a confession, it is incumbent upon the state to specifically rebut these allegations. State v. Davis, 380 So.2d 607, 610 (La.1980). Additionally, the admissibility of a confession is, in the first instance, a question for the trial court. A trial court's conclusion on the credibility and weight of testimony relating to the voluntariness of a confession, for threshold admissibility, will not be overturned on appeal unless it is not supported by the evidence. State v. Jackson, 381 So.2d 485 (La.1980).
The State met its burden. The trial court did not err in refusing to suppress Davis's statement. The record shows Davis was advised of his rights, was oriented and coherent, and freely and voluntarily gave the statement.
No. 28Admission of Davis's pistol: Davis argues at the time he was arrested no warrant had been issued for his arrest or for the search of his car. After Davis was arrested, his passenger, Marlin Rogers, was removed from the car and patted down. The .25 caliber pistol was found. Davis sought to suppress the pistol because it was discovered through a warrantless search. The trial court denied the motion, ruling the seizure was valid. Davis argues that there was no exception to the search warrant requirement, for example, search incident to arrest or the automobile exception. He claims the search exceeded a search incident to arrest because the gun was not found in an area under his immediate control and that the automobile exception did not apply because there was no probable cause that the car contained evidence or contraband.
When the stop and arrest occurred, several officers and patrol cars blocked Davis's car in his driveway. Davis claims that because the area was secure, a warrant could have been easily obtained and notes that the police were even in the process of obtaining search warrants when the arrest was made. He argues that the pat-down of Rogers exceeded a Terry stop because there was no evidence showing Rogers was armed or dangerous.
Officer Rambin was justified in making a simple pat down of both men until he could determine which one was Davis. The police knew Davis was armed and dangerous. The fact that the warrant was not yet signed did not negate probable cause for arrest without a warrant. The stop and frisk were clearly permissible under the Terry reasonable suspicion standards. Exigent circumstances existed because the video had been shown on television. Moreover, the frisk of Rogers was warranted and necessary because Davis *1025 had an apparent accomplice during the Moore murder-robbery, according to Adgate.
The trial court opined that "good luck" and police work resulted in the arrest of Davis, noting that the apparent accomplice, Rodney Hill, came to the police, telling them who Davis was. Concerning the arrest, the trial judge correctly ruled that the police had probable cause to arrest the defendant because of the identifications made by Hill and Adgate. The trial court noted that the arrest warrant, which was in the process of being prepared when Davis was arrested, would have been signed by a magistrate. The trial court believed exigent circumstances existed to arrest Davis without a warrant because of his mobility in his car, the fact that video tape had been broadcast, and that the state line is within 60 miles north and west of Shreveport. We agree that exigent circumstances and a "mountain of probable cause" existed for a legal arrest without a warrant. The officers who made the stop and arrest were directed by other officers, who were "99 percent sure" the correct car was the one being followed and then stopped. The seizure of the pistol that fell from Marlin Rogers was legally permissible.
The right of law enforcement officers to stop and interrogate one reasonably suspected of criminal activity is recognized by La.C.Cr.P. Art. 215.1 and state and federal jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). The right to make an investigatory stop and question the individual detained must be based on sufficient knowledge justifying a belief that the person has been or is about to be engaged in criminal conduct. State v. Pautard, 485 So.2d 909 (La.1986). It is clear that an officer may make a protective search of the suspect for his own safety and the safety of others. State v. Landry, 393 So.2d 713 (La.1981). Since the justification for such a search is the protection of the investigating officer and others nearby, the search "must therefore be confined to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, supra, 392 U.S. at 29-30, 88 S.Ct. at 1884.
Davis's argument that the police exceeded the scope of the stop by searching Rogers is patently without merit. Davis's distinctive car had been used in a murder. The police had reason to believe each of its occupants had committed crimes and could be armed.
Nos. 9, 24, 26 and 32The Videotape: Davis contends that the jury should not have seen the video tape of the murder at Fat's Exxon. Davis initially filed a motion in limine to preclude the state from introducing the tape taken by a stationary remote video camera. He argued the prejudicial impact of the video outweighed its probative value and that it unfairly appealed to the jury's emotions. See La.C.E. Art. 403. He claims the introduction of the tape denied him the opportunity to cross-examine his accusers and was presented solely to inflame the jury. Davis argues the videotape is merely cumulative of other testimony and photographs and mentions that he offered to stipulate to the manner of death and the sequence of events. He claims the court should have undertaken to determine if the video camera was tested and in working order and should have required testimony in connection with the tape showing it was preserved and that it was not edited. At least three times at trial Davis objected to the introduction of the tape, especially when the court permitted the jury to take the tape, State's Exhibit # 10, to the jury room during death penalty deliberations, which he argued was the same as having testimony repeated during deliberations and requires reversal.
A videotape, which is like a photograph, is neither testimony nor written evidence and is not excluded by La.C.Cr.P. Art. 793. A photograph is a reproduction of a physical object or scene. It is not "written" evidence of "testimony" within the meaning of La.C.Cr.P. Art. 793, which prohibits the use of written material during deliberations. Hence, a jury's request to see a videotape after it retired to deliberate on the penalty phase is not an abuse of the court's statutory discretion. See State v. Overton, 337 So.2d 1058 (La.1976).
*1026 Concerning the admission of the video during the guilt phase, we see no reason why the law on still photos should not apply equally to this video. See La.C.E. Art. 1001(2). The video is in black and white, without sound, and contains no close-ups. The video is extremely probative considering the State's burden of proving the robbery, specific intent and negating Davis's intoxication defense. The tape portrays Davis's deliberate and unhesitating murder of Calvin Moore, the unnecessary shooting at Norma Moore, and the taking of money from the cash register. Even without audio, the tape reveals the specific threat of Davis to again shoot Mr. Moore, easily determined by lipreading Davis in the light of Mrs. Moore's testimony. Merely because the video may be "cumulative" evidence does not render the tape inadmissible. State v. Garrison, 400 So.2d 874 (La.1981). The video was not wholly cumulative because the testimony did not cover everything shown on the video. Mrs. Moore did not see the initial shooting or realize that Davis had fired at her. Mrs. Moore testified that the video was an accurate recording of the events on the fatal night. She and Detective Ashley testified that the video was taken from Fat's Exxon on the night of the murder. The video was not edited in any way and was highly probative.
Photographs of the victim at the murder scene are generally admissible to prove corpus delicti, corroborate other evidence and to establish cause of death, identity, or the number, location and severity of wounds. A trial court's ruling on the admissibility of such evidence will be disturbed only if the prejudicial effect of the evidence outweighs its probative value. State v. Eaton, 524 So.2d 1194, 1201-02 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Celestine, 443 So.2d 1091, 1095 n. 1 (La.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984); State v. Germain, 433 So.2d 110, 118-19 (La.1983); State v. Brogdon, 426 So.2d 158, 169 (La.1983), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). The fact that the photographs are gruesome does not of itself render photographs inadmissible. State v. Beach, 320 So.2d 142 (La. 1975).
The trial court correctly ruled at the pretrial motion in limine that the issue was similar to the admissibility of still photographs, holding that the videotape was admissible to corroborate other testimony in this case, such as location of the bodies, manner of death, specific intent to kill, and cause of death.
The tape's probative value, especially regarding Davis's intoxication/lack of specific intent argument, was not outweighed by its possible prejudicial effect.
No. 29Davis asserts the trial court erred in not allowing him to present evidence concerning his habits and routines under La. C.E. Art. 406. He argues his Sixth Amendment right to present a defense was thwarted. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Davis urges he was denied the right to put before the jury evidence that might influence determination of his guilt.
The record reflects that Davis's girlfriend, Vanessa Ferguson, was allowed to testify that Davis would use cocaine on weekends after he got paid and that he would drink a lot of beer. She explained that when on cocaine "sometimes he was happy and then sometimes it was like something was wrong." When continuation to this line of questioning was objected to, the court sustained the objection. The prosecutor argued unless the questions could be narrowed down to the dates near the offenses, the testimony was irrelevant. As he now argues, Davis countered, claiming the testimony was admissible pursuant to La.C.E. Art. 406. The court agreed with the prosecutor that the testimony might become relevant if narrowed to relevant times and places. Defense counsel claimed he was attempting to establish a habit and because he was not being allowed to do so, tendered the witness for cross-examination. The assistant district attorney made it clear that the State would not object to questioning Ms. Ferguson regarding the specific dates surrounding the offenses and whether Davis acted in conformity on those occasions with the way he acted on other weekends. On cross-examination, Ms. Ferguson *1027 was impeached with a portion of her statement to the police shortly after the defendant's arrest wherein she stated that she never saw the defendant "do" drugs.
C.E. Art. 406 provides:
Evidence of the habit of a person or the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
Davis claims the evidence showed a habit and was relevant to prove conformity with the habit on the two nights of the murders. He claims his drug use was a habit, as opposed to a character trait, because it was specific, nearly invariable, and semi-automatic because the offered testimony concerned what Davis did on repeated specific occasions when he got home.
The State argues that Vanessa Ferguson was not trying to establish habit, but rather Davis's personality while under the influence of drugs and/or alcohol. Ms. Ferguson explained that Davis's cocaine use was not that regular around the times of the murder. Davis was allowed to show to the jury, through his confession, corroborated by Mitchell's testimony about the Sanchez robbery-murder, that Davis ingested alcohol and/or drugs before each murder.
The trial court did not err in finding defense counsel's questioning irrelevant. Defense counsel was attempting to prove that the defendant regularly or habitually became intoxicated so as to bolster his defense that Davis was likely intoxicated when he committed each murder. It does not appear Ms. Ferguson's testimony was sufficient to establish that Davis's drug and alcohol problems rose to the level of a "habit" under La.C.E. Art. 406. See State v. Flowers, 574 So.2d 448 (La.App.2d Cir.), writ denied, 580 So.2d 666 (La.1991) (testimony by third parties as to homosexual advances by victim related similar but unidentical acts and did not rise to level of "habit" to be admissible to support defendant's self-defense theory).
Ms. Ferguson's testimony that Davis sometimes did drugs on weekends and after work sometimes is inadmissible. La. C.E. Art. 404(A) provides, in part, that "[E]vidence of a person's character or a trait of his character, such as moral quality, is not admissible for ... proving that he acted in conformity therewith on a particular occasion..." More importantly, the line of questioning was properly restricted pursuant to La. C.E. Art. 403 because even if Davis's prior drug use was relevant in the broad sense, probative value of the evidence was substantially outweighed by confusion it may have caused the jury. We find no error. The jury was presented with testimony which indicated Davis was intoxicated and drugged during each murder, but discredited such evidence.

USE OF OTHER CRIMES EVIDENCE AT SENTENCING HEARING
Davis contends that the trial court erred in allowing the state to introduce other crimes evidence at the sentencing hearing. After a hearing on the use of other crimes evidence, the trial court ruled that the state would not be allowed to use evidence of the armed robbery/attempted murder of Johnny Hall, which occurred about 45 minutes after the Mark Sanchez murder, in the guilt phase of the trial, but would be permitted to introduce this evidence and evidence of the armed robbery/assault of Mark Lavigne during the penalty phase of the trial.
A. The following shall be considered aggravating circumstances:
. . . . .
(3) The offender has been previously convicted of ... armed robbery
. . . . .
La.C.Cr.P. Art. 905.4
Davis incorrectly asserts that his guilty plea to armed robbery in the Lavigne incident did not constitute an admissible "previous conviction" because he did not *1028 plead guilty until after the instant offenses even though the armed robbery occurred before the instant offenses. This court recently answered Davis's contention. A conviction for a murder committed after the murder for which the defendant was on trial can support the finding of the aggravating circumstance, [that the defendant had been previously convicted of an unrelated murder], when the conviction of the later murder occurred before the sentencing phase of the trial of the first murder. State v. Wille, 559 So.2d 1321 (La.1993), cert. denied, ___ U.S. ___, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992).
Davis also asserts that unadjudicated armed robbery/attempted murder of Johnny Hall is not a true aggravating circumstance and that he was sentenced to death solely because of his alleged bad character. He asserts that he has not been convicted of the crimes against Johnny Hall.
[A] sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender.... Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue.... The jury may consider any evidence offered at the trial on the issue of guilt....
La.C.Cr.P. Art. 905.2.
Unadjudicated crimes committed by a defendant, and proved by clear and convincing evidence, can be used during the sentencing phase of a capital murder trial. State v. Brooks, 541 So.2d 801 (La.1989).
[E]vidence of unadjudicated crimes at the sentencing phase of the trial will be admissible once a trial court determines: 1) the evidence of defendant's connection with the commission of the unrelated crimes is clear and convincing; 2) the proffered evidence is otherwise competent and reliable; and 3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is the focus of the sentencing hearing...

State v. Brooks, supra at 814.
In the sentencing phase of a trial, capital or otherwise, the probative value of character evidence is extremely high, since the character and propensities of the defendant are the principal inquiry, and the unquestionably devastating prejudicial effect does not outweigh such high probative value. State v. Jordan, 440 So.2d 716, 722 (La.1983). Crimes of violence against the person indicate moral qualities and character traits pertinent to propensity to commit first degree murder. State v. Jackson, 608 So.2d 949 (La.1992).
The primary limitation placed on this type of evidence is remoteness of the evidence. Jackson specifically limited the criminal conduct which the prosecutor could introduce evidence to that conduct which the period of limitation for instituting prosecution had not run at the time of the indictment of the offense under consideration.
Evidence of the Hall armed robbery/attempted murder was not remote and was relevant and helpful to the jury's determination of the appropriate sentence to be imposed after guilt had been decided. The Lavigne and Hall armed robberies occurred within a week of the Sanchez and Moore murders and were not prescribed when Davis was indicted for the murders. Moreover, the unadjudicated Hall shooting was clearly admissible and proved by reliable and competent evidence. Hall positively identified Davis. The cartridge found at the scene during the Hall investigation was fired by Davis's pistol.
The trial court did not err in allowing evidence of the two prior offenses at the sentencing hearing. The evidence that Davis committed the crimes against Hall was clear and convincing. Davis was convicted by his plea of guilty to the crime against Lavigne.

CAPITAL SENTENCE REVIEW
No. 35Davis contends that the trial court erred in sentencing him to death. Pursuant to La.C.Cr.P. Art. 905.9, and Louisiana Supreme Court Rule 28, this Court reviews every sentence of death in this state to determine if it is constitutionally excessive. In making this determination, we consider whether the sentence was imposed under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports *1029 the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed, considering both the offense and the offender.
The uniform capital sentence report submitted in this case reveals that Davis is a black male, born on June 28, 1965, with one child whom he did not support. Davis's father died when he was seven years old. The defendant completed high school and has a medium I.Q. of slightly over 70. He was found to have a mild degree of cognitive impairment and to be dependent on alcohol and drugs. He also has a mild organic brain dysfunction. Davis has a sporadic work history and was in the Army for a short period. Apparently Davis's only prior conviction was for the June 23, 1990, armed robbery of Mark Lavigne in Bossier Parish, for which he received a 50-year sentence. The report reflects that the aggravating circumstance of each murder that was argued (perpetration during an armed robbery) was found by the jury and that the jury considered the mitigating factors Davis argued (no significant criminal history, the offense was committed while under the influence of extreme mental disturbance, his youth, and most importantly, that at the time of the offense he was unable to appreciate the criminality of his conduct because of impairment due to intoxication). The report shows that Mr. Sanchez was an Hispanic male in his mid-20's and that Mr. Moore was a white male in his mid-40's. The report also states that the evidence to sustain each verdict forecloses all doubt concerning Davis's guilt. Davis, of course, takes issue with this finding in his opposition to the report.

EVIDENCE AT SENTENCING HEARING
The State first presented Johnny Hall who testified Davis shot him with a pistol about 3 a.m. at Fats' Exxon on June 29, 1990. Officer Travis Ford reported his investigation of the Hall armed robbery/attempted murder and also testified that Sanchez had been killed just an hour before Hall was shot. The State next proved the Mark Lavigne armed robbery/assault in Bossier. The Bossier investigating officer described how Lavigne was hit on the head with the gun. A Bossier Parish assistant district attorney established Davis's conviction by a guilty plea. The Bossier prosecutor revealed that Lavigne identified Davis from photographs and that Davis also stole Lavigne's watch from his person during the robbery. The state lastly called a firearms expert, Richard Beighley, who testified that the cartridges recovered from the Hall and Lavigne offenses were definitely fired from Davis's .25 caliber pistol.
Davis called his mother as his first witness. She testified that drugs ruined her son and pleaded for his life. Davis's aunt testified that he had confided in her about his drug problem shortly before his arrest. Davis next presented Dr. Mark Vigen, a psychologist, who examined Davis. His written report was attached to Davis's sentence review memorandum. Dr. Vigen noted the 25-year-old defendant was hit by a car at age nine, rendering him unconscious for a few minutes. Dr. Vigen concluded that Davis was a drug addict and an alcoholic. Dr. Vigen noted that Davis failed high school in 11th grade and was sent to the School Away from School program and that he ultimately graduated from Green Oaks High School in 1985. Davis then attended Southern University in Shreveport, but failed. He then joined and subsequently withdrew from the Army after brief service. The doctor noted Davis's work history, mostly in the food service industry, mentioning that Davis worked at Shoney's for almost two years. The doctor learned that Davis began using crack cocaine around age 18 or 19. The doctor was informed that on the night of the Moore murder, Davis shared at least a case of beer, half a pint of whiskey and $50 worth of cocaine. The doctor found Davis's I.Q. below average; his Wechsler Adult Intelligence Scale Revised Full Scale IQ was 74, which places him in the 4th percentile of measured intelligence and in the borderline range. The doctor testified Davis was chemically dependent and possessed mild organic brain dysfunction.
Dr. Joe B. Hayes, an expert in the field of psychiatry and chemical dependency or substance *1030 abuse, also testified for Davis. He relied on statements from Davis and his mother in concluding that Davis exhibited poor judgment because of his addictions. A prospective trial juror who had been excused because she knew Davis in high school, also testified. She said Davis was respected and likeable. A friend of Davis's for 22 years and his sister also testified on his behalf.
Finally, Davis took the stand. The only offense he could remember was the robbery-shooting of Moore, explaining that he did not recall wanting to kill Mr. Moore. Davis was cross-examined about the insurmountable evidence against him and ultimately said he was sorry for whatever he had done.

PASSION, PREJUDICE, AND ARBITRARY FACTORS
Davis argues that prejudicial factors created a risk that the sentence was imposed in an unjust manner. These factors include the State's alleged use of its peremptory challenges to exclude blacks and the introduction of the videotape. These arguments are addressed in other parts of this opinion. The State emphasizes that Davis is black, his victims were white (Moore) and Hispanic (Sanchez), and that two black jurors and a black alternate were on the jury. There is no indication in this record that the imposition of the death penalty was the result of passion, prejudice, or other arbitrary factors.

AGGRAVATING FACTORS
Davis repeats two of his arguments: that the armed robbery finding in the Sanchez murder was not sufficiently proved; and that the state should not have been allowed to use the Lavigne (Bossier) offense as an unrelated conviction to support the death penalty.
Davis next argues that there was no evidence showing that the Sanchez murder was especially heinous, atrocious, or cruel because there was no evidence of "torture or the pitiless infliction of unnecessary pain" on Mr. Sanchez. State v. Sonnier, 402 So.2d 650 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); State v. Monroe, 397 So.2d 1258 (La.1981). As mentioned, on Count 1 (Sanchez) the jury found the following aggravating circumstances: 1) the offender was engaged in the perpetration of an armed robbery; 2) the offender had been previously convicted of an armed robbery; 3) the offense was committed in an especially heinous, atrocious, or cruel manner.
In State v. Wilson, 467 So.2d 503 (La. 1985), cert denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985), murder by means of a point blank shotgun blast to the face, without indication that the victim was aware of the impending assault, was not an "especially heinous, atrocious, or cruel" aggravating circumstance. We have assumed, arguendo, that Davis is correct that the evidence does not support a finding that the Sanchez murder was especially heinous, atrocious, or cruel.
As we have noted, the failure of one statutory aggravating circumstance does not invalidate a death penalty if another aggravating circumstance is supported by the evidence, so long as the evidence offered in support of the arguably unproven aggravating circumstance did not inject an arbitrary factor into the proceedings. Clemons v. Mississippi, supra; Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); State v. Wilson, supra; State v. Sawyer, 422 So.2d 95 (La.1982), cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984). The State did not argue or urge the jury to find the Sanchez murder was especially heinous, atrocious or cruel.
The other two aggravating factors are supported by the evidence. See discussion supra. The jury's assumed incorrect finding that the murder was committed in an especially cruel manner does not invalidate the recommendation of death for the Sanchez robbery-murder or establish that the imposition of the death penalty was the result of arbitrary factors.

PROPORTIONALITY REVIEW
Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 *1031 L.Ed.2d 29 (1984). Nevertheless, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Code, supra; State v. Burrell, 561 So.2d 692 (La. 1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, supra; State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); State v. Kyles, 513 So.2d 265 (La.1987).
Davis simply lists nine similar armed robbery homicides in which no death penalty was imposed and three multiple count homicides in which no death penalty was imposed as a way of comparison to counter the state's list of all death penalty verdicts rendered in the First J.D.C. after January 1, 1976. Moreover, Davis again stresses that because of his intoxication or mental defect or disease, it was shown that he could not understand the criminality of his actions or conform his conduct to the requirements of law. La.C.Cr.P. Art. 905.5(e). We cannot find that the jury acted unreasonably in rejecting Davis's lack of a criminal record and intoxication defense as a mitigating factor. See State v. Lee, 524 So.2d 1176 (La.1987).
Where the number of "similar" cases within a district is insufficient for comparison, we are free to "refer to similar cases or comparable cases elsewhere in the performance of [our] constitutional and judicial duty to conduct a meaningful comparative proportionality review." State v. Brogdon, 457 So.2d 616, 632 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985).
This court has consistently affirmed death penalties in other cases involving killings during the course of a robbery. State v. James, 431 So.2d 399 (La.1983), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1974); State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983); State v. Lindsey, 404 So.2d 466 (La.1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983); State v. Busby, 464 So.2d 262 (La.1985), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985); State v. Messiah, 538 So.2d 175 (La. 1988), cert. denied, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990).
This case offers no compelling reason for departing from the general rule. Davis's crime spree, during which he killed two people, shot, or shot at, two others, and hit a fifth victim in the head with his pistol, warrants labeling him as a particularly dangerous offender for whom the most severe sanction provided by law is not disproportionate to the nature or pattern of his criminal conduct or to the recommendations of death in similar cases.

DECREE
For the reasons assigned, the conviction and sentence of defendant, Percy Davis, are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until:
(a) defendant fails to petition the United States Supreme Court timely for certiorari;
(b) that court denies his petition for certiorari;
(c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari; or
(d) that court denies his application for rehearing.
AFFIRMED.
ORTIQUE, J., concurs in result.
NOTES
[1] Calogero, C.J., not on panel. Rule IV, Part 2, § 3. Chief Judge Charles A. Marvin of the Court of Appeal, Second Circuit, sitting for Dennis, J.
[2] On April 1, 1991, before he was tried for the two murders here appealed, Davis pleaded guilty to this crime. At the penalty phase in the murder trial, the ballistics tests were introduced and Lavigne identified Davis as the person who robbed him.
[3] State v. Prieur, 277 So.2d 126 (La.1973).