COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

VERSUS

JEFFREY PAUL DENBY

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2009-663
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Elizabeth A. Pickett, Judges.

AFFIRMED.

Hon. David W. Burton
District Attorney - 36th JDC
P. O. Box 99
DeRidder, LA 70634
(337) 463-5578
Counsel for Appellee:
State of Louisiana

Mark Owen Foster
Louisiana Appellate Project
P. O. Box 2057
Natchitoches, LA 71457
(318) 572-5693
Counsel for Defendant-Appellant:
Jeffrey Paul Denby

**PICKETT, Judge.**

The defendant, Jeffrey Paul Denby, appeals his conviction for first degree murder. For the following reasons, we affirm the defendant's conviction.

<u>FACTS</u>

On June 18, 2009, eighteen-month-old John Thomas Anthony Brewer, known as J.T., arrived at the Beauregard Memorial Hospital with severe head injuries. He was having a seizure when his mother ran into the emergency room with him. His mother told emergency room physician John McMillan that her son had fallen on the steps and hit his head on the steps and stairs. Dr. McMillan found a number of bruises to the child's head and to the body. J.T.'s eyes were irregular. One pupil appeared enlarged and the other was a pinpoint, a sign of severe brain injury. J.T. was also not breathing appropriately. His score on the Glasgow Coma Scale was a three, indicating that he had a traumatic brain injury that was major and life-threatening.

Dr. McMillan explained at trial that J.T.'s symptoms indicated a brain herniation. The injury to J.T.'s head caused his brain to swell to the point it was no longer able to fit inside his skull. A subdural hematoma compressed the brain, and the pressure of that hematoma pushed J.T.'s brain through the opening at the lower portion of his skull, where the brain stem connects the skull and the spinal cord.

As he tried to determine the mechanism of J.T.'s injuries, Dr. McMillan found multiple sets of bruises on the child's face and head, with different phases of bruising. Of most concern to Dr. McMillan was a significant amount of bruising to J.T.'s left eye as well as the left ridge of his cheekbone and to the ear. Dr. McMillan found blood behind the left eardrum, which was a serious concern. Dr. McMillan suspected

1

abuse because the history was not consistent with the mechanism of injury and the series of injuries. He gave J.T. medication to stop his seizure activities and to sedate and paralyze him to prepare him for transport to Lake Charles Memorial Hospital.

Dr. McMillan took seven photographs of J.T. that were admitted into evidence:

- Exhibit A-1 shows bruising to both eyes of the intubated child.

- Exhibit A-2 was taken from the child's left side showing bruising to both eyes, predominantly on the left; old and new bruises to the cheekbone; and an old bruise to the forehead.

- Exhibit A-3 is another frontal photograph showing the different ages of the bruises and a bite block in place in the case of seizure activity.

- Exhibit A-4 shows the left side, primarily the cheekbone bruising, and also bruising to the left ear.

- Exhibit A-5 is another photograph showing bruising to the eyes and upper part of the forehead, causing Dr. McMillan to suspect "assault that occurred more than just this one time."

- Exhibit A-6 shows the most significant bruises to the eye, cheekbone, and pinna of the ear.

- Exhibit A-7 shows a new bruise to the back part of J.T.'s head and bruising behind the ear.

The photographs were admitted over the defendant's objection. Dr. McMillan documented an immediate need for neurosurgery because of the traumatic brain injury and time was of the essence because J.T. was going to die unless neurosurgical intervention could take place.

At Lake Charles Memorial Hospital, J.T. had another CT scan. Dr. Jamel Saqer, a pediatric intensive care specialist with the Children's Clinic of Southwest Louisiana, testified as an expert in pediatric critical care. His comparison of the

Beauregard and Lake Charles CT scans showed that J.T. had brain swelling on the entire left side, and also on the front of the right side, causing herniation of the brain. An accumulation of blood, a subdural hematoma, was in the membrane between the skull and the brain. The swelling ultimately affected blood circulation to the brain and deprived the brain of oxygen, causing an anoxic infarction that would lead to brain death.

J.T. underwent surgery to relieve the pressure in his brain and to prevent further damage from increased brain pressure. Dr. Wolf removed a portion of the skull so that possible continued swelling would not be detrimental to the circulation in the brain. The pressure in J.T.'s brain initially came down, but the force supplying blood to his brain also gradually declined.

After the surgery, J.T. experienced tensing motions referred to as "posturing movements," where he would involuntarily stretch his arms and legs. The posturing movements, treated with sedatives, pain medication, and seizure medication, were caused by increasing pressure inside J.T.'s head. By June 20, 2009, it was evident that the swelling was actually infarction, and the posturing movements were the only movements that J.T. exhibited. On June 21, 2009, Dr. Wolf and Dr. Saqer shared the opinion that "[t]here [was] no reasonable recovery of brain function." Despite mechanical ventilation by a breathing machine, blood pressure medication, intravenous fluids to prevent dehydration, medications to regulate body temperature and brain activity, and the use of a cooling blanket, intracranial pressure continued to escalate, and CT scans showed no improvement. Life support was stopped at 9:30 p.m. on June 21, and J.T.'s heart stopped at 12:15 a.m. on June 22.

3

Dr. Saqer could not say with medical certainty that J.T. would have died if the life support had not been discontinued. However, he opined that J.T.'s best case scenario would have been a vegetative state requiring machine support and a feeding tube, and he would have had no intellectual activity. J.T.'s brain damage was irreversible, and he was being kept alive by the ventilator. Dr. Saqer did not reach the point of declaring J.T. brain dead because of the family's request to discontinue life support. Severe brain injury was the sole cause of death.

A video and eight photographs were taken at Lake Charles Memorial Hospital. The state sought to admit the still photos which depicted the same scene as the video. It sought to use:

> approximately a minute or so of the video to fulfill the purpose of showing the extent of injuries and the treatment required as a result of those injuries and the movement of the child known as seizures or posturing as will be described by Dr. Saquer [sic].

Over the defendant's objection, the trial judge allowed the first minute of the video to be shown, but none of the still pictures. Dr. Saqer testified that the video showed the posturing movements. Although J.T. had multiple bruises on the frontal part of his face, a laceration and bleeding in the left ear, and a bruise on the right temple, those injuries were not visible on the video because of the bandage on J.T.'s head.

Dr. Terry Welke performed the autopsy on J.T. and testified as an expert in forensic pathology. He found bruises above J.T.'s left eyebrow, in the left ear, on the right ear, in front of the right ear, on the mid-portion of the forehead, another bruise above the left eyebrow, and one in the left back of the head. He also found petechia, little red marks on the nose area, often seen in individuals that have died as a result of asphyxia. Dr. Welke reviewed photographs consistent with a possible bite wound on J.T.'s right upper arm. J.T. had two bruises above the right buttock, two bruises

4

above the left buttock, and a little superficial scrape on the inner portion of the right lower leg. Dr. Welke also found brain swelling and an accumulation of blood between the dura and the brain. He believed that the cause of death was head injury as a result of blunt force to the head, and he believed that the manner of death was homicide. The injuries were not consistent with a fall down stairs.

Detective Jared Morton believed that a criminal investigation was necessary, based upon the inconsistencies in the information given to Dr. McMillan. That investigation began with an interview of the defendant at the Beauregard Parish Sheriff's Department on June 18, 2009. After the defendant gave his statement, he was arrested and charged with attempted first degree murder and second degree cruelty to a juvenile. After J.T. died on June 22, the charge was changed to first degree murder, and the defendant gave another statement.

Prior to J.T.'s death, the defendant lived in a home owned by the grandfather of Paul Hilliard. Also residing there were Hilliard; Hilliard's fiancé, Miranda Denby;[1] Clara, Miranda's three-year-old child; Courtney, Miranda's eighteen-month-old child; Holly Brewer, J.T.'s mother and the defendant's girlfriend; Allison, the three-month-old child of Holly and the defendant; and J.T. In the defendant's first statement on June 18, 2009, he said he had run Hilliard's paper route for him that morning. He came home around 6:00 a.m. and slept until 9:30 or 10:00 a.m. Holly and the four children were in the home when he awoke. Holly left around 11:00 a.m., leaving the defendant to watch the four children.

The defendant stated that he went outside. Just as he returned indoors, J.T. "grabbed the bassinet where Allison was sleeping and, and dumped it over." The

---

[1]Miranda Denby and the defendant were legally married at the time.

defendant stated that he picked her up, got her "quieted down," and "made sure she's fine." According to the defendant's first version, he then took J.T. "to the couch, laid him over, across [his] lap, and whooped him 4 times across the butt," over J.T.'s shorts and diaper. J.T. cried for a while and pouted a little; the defendant held him and watched a movie for about an hour.

The defendant said when he fell asleep, J.T. "had got ahold" of a baby gate in front of the stairwell. The safety bar of the gate broke, and J.T. fell and "bumped his head on the floor." J.T. cried, but he seemed to be all right. The defendant said he quieted J. T. again and left the room. About ten minutes later, the defendant said he returned to the room and found the baby gate down again and J.T. was standing at the top of the stairs. As the defendant started up the stairs, he said J.T. tripped over his feet and fell from around the third or fourth stair about five or six steps, until the defendant caught him around the second stair. The defendant said he checked J.T.'s pupils with a flashlight, and they were responsive. The defendant said that he "[d]idn't nothing feel broke" when he checked J.T.'s arms and legs. The defendant said he kept J.T. awake for about an hour. He noticed a little bit of redness on the back of J.T.'s head, close to the top.

Shortly after 2:00 p.m., the defendant said he gave the children a snack, and J.T. lay down in his bed in the girls' room where he normally slept. When Holly returned home around 2:45 or 3:00 p.m., the defendant told her that the children were all asleep. The girls awoke and began to play, but J.T. was still asleep. The defendant checked on him, and said "he wasn't jerking or nothing like he was when we brought him to the hospital."

6

The defendant was outside when Holly told him J.T. was not waking up. The defendant found J.T. with a high temperature, "shaking real bad," with a non-responsive left pupil. They tried to cool him in a bath and tried to awaken him. When they were unsuccessful, they took him to the hospital around 5:30 p.m.

During the interview, detectives told the defendant that J.T. had old and new bruises and hemorrhaging inside his head. They told the defendant that they thought he was lying, that J.T. had been abused, and that he was responsible for it. The defendant admitted that he had probably hurt J.T., but he did not know how.

The defendant then admitted that J.T. had not fallen down the stairs. When detectives again noted that J.T. had been abused for some time, the defendant responded, "I'm not the only one that does it though."

When J.T. turned over the bassinet, the defendant proceeded to spank J.T. He admitted that the spanking got out of hand. He said that he began spanking J.T. "on his butt" with and without the diaper. The defendant admitted to "popping him in the head" with his fingertips, all over J.T.'s head. He picked up J.T. and held him under his arms, "hollering at him why did he do that." He "sat [J.T.] down hard" on the couch and "continued to whip his butt." He "smacked him in the top of the head a couple more times." The defendant "put [J.T.] in the bed and walked off," but J.T. would not stop screaming and crying. The defendant said he then "whooped him a little more and popped him in the head with his pillow" as he routinely did. J.T. "shut up" for about three minutes, and the defendant left the room. When J.T. began to cry again, the defendant grabbed the pillow again and "popped him a couple more times in the head, it was pretty hard." J.T. "cocked his head back and forth because [the

7

defendant] went one direction, then [he] went another one" about three times, and the defendant admitted he knew he hurt him.

For about five minutes, J.T. was quiet. The defendant went to the living room to hold the baby, who was crying again. J.T. began screaming and crying again. The defendant said, "he kept crying and kept crying, and kept crying, and it just heated me up, heated me up and I got mad again because I had calmed down." The defendant said he picked up J.T. and put him down hard on the twin bed. J.T. hit his head on the wooden footboard. Not meaning to hurt him like that, the defendant said that he rubbed J.T.'s head, put him in the toddler bed, and told him to go to sleep and be quiet. According to the defendant, "that normally works, it didn't this time so he kept crying, so I hit him a little harder in the top of his head." When J.T. cried harder, the defendant "popped him in his face, on his face." According to the defendant, "that's where he got the, the dots under his eyes."[2]

J.T. quieted down again, and the defendant left the room. When he returned, J.T. was screaming again. The defendant said he "popped him in the side of the head and [he] accidentally hit him in his ear." J.T. cried even harder, and the defendant carried him to the living room as J.T. "started screaming even louder." The defendant laid him in his arms and "tossed him over on the couch . . . and his head hit the couch arm." The defendant described the blow as "another lick on the back of his head," and he described the arm of the couch as "a pretty hard arm." J.T. looked at the defendant with "his mad face," so the defendant again "pop[ped] him on his mouth" and sent him to his room. The defendant laid J.T. in his toddler bed, and J.T. was quiet. The defendant "was mad so [he went] outside and smoke[d] a cigarette."

---

[2]Presumably, these "dots" are the petechia to which Dr. Welke referred, a sign of lack of oxygen to the brain.

8

When Holly arrived home around an hour later, J.T. was not awake. "A little while later," Holly told the defendant J.T. was "not wanting to wake up." She said J.T. had bruises on his head and his arm. He went inside with Holly and found bruises on J.T.'s head, arms, and face. J.T.'s left pupil was not responsive.

The defendant said J.T. was not unconscious when he put him in the bed. He was tossing and turning like he normally did when he did not want to go to bed. The defendant had not yet told Holly what he had done when J.T. was at the hospital. He told police "[t]his is the first time I've lost it that bad." Normally, he would "just pop him around a couple of times," spank J.T. on his arms, sometimes spank him on his butt and sometimes "use the, the broom head, which is the bristles and then pop him across his face and go just down his face like that." At the end of the interview, the defendant stated, "it's never been this bad. I've never done it though like this. It's just when he dumped Allison over I, I, I snapped. I couldn't . . . ."

In the defendant's second interview on June 22, 2009, he said he "had a bad feeling in the back of his head" about J.T. when he left him in his bed, and he was afraid he may have hurt him. He felt like "something about the situation told me something here is not right." The defendant said he "was pretty mad" when J.T. pulled over the bassinet, and J.T. made him more mad when "he kept screaming at [him]," babbling, and giving the defendant "the mean look." The defendant tried to quiet J.T., but he just kept "screaming and screaming his head off," not crying, just screaming; this "kinda made [Defendant] mad and it kinda made [him] worried."

The defendant said he did not know why he did not stop. He said, "[h]onestly it was one of them sorta things w[h]ere you just sorta black out and things happen . . . I knew what was happening. I just, its [sic] kinda like one of them things w[h]ere

9

you're trying to control yourself but you just can't." He told the deputies this had never happened to him before. The defendant said he knew what he was doing, but he could not stop, and he knew he "went overboard." It was "like [he] couldn't control what [he] was doing." He kept thinking he needed to stop, but he "kept going." The defendant said he "think[s] [he] went to the point where [he] was so mad that [he] just couldn't stop."

J.T. turned over the bassinet between 12:30 p.m. and 1:00 p.m. The defendant lay him in his bed around 2:30 p.m. The beatings took place in spurts, where J.T. would stop screaming, and the defendant would stop hitting him. When J.T. would scream again, the defendant would hit him again. The defendant said he could not think when he lost control; it was like he was watching a movie, with no control over what took place. The longest J.T. was quiet was about ten minutes.

When the defendant learned of J.T.'s death, he said he believed he was responsible for it. He had lied about J.T. falling down stairs because Miranda had been "in trouble with OCS a few times before," and she "didn't want OCS coming to her house."

Paul Hilliard corroborated much of the defendant's story. He and Miranda returned to the home around 5:45 p.m. on June 18, 2009. By the time they arrived, Holly had returned from Lake Charles, and the defendant was there also. Holly told Hilliard that J.T. was sleeping, and Hilliard checked on him. J.T. was moving and "appeared to be asleep on his bed."

When Hilliard first arrived at the home, the defendant told him that he had given J.T. the whipping of his life. The defendant told Hilliard that J.T. had knocked over his daughter's bassinet and that he had whipped him for it and put him to bed.

10

When J.T. did not appear for supper, Hilliard gave his plate to Holly to go feed him. Holly screamed and ran outside for the defendant; Miranda went into J.T.'s room and saw that "he wasn't waking up." Hillard saw no bruises or markings, but J.T. was not waking, and he had "[s]udden twitches, here and there; like a bad dream." Holly said J.T. had a fever, and she took him to the bathtub to cool him. Hilliard shined a flashlight in J.T.'s eyes; J.T.'s right eye "seemed to appear normal," but his left eye "didn't respond at all and it had a—what looked like a crack going on all the way across it." The defendant and Holly took J.T. to the hospital around 7:00 p.m. The defendant "just said before he left that he didn't know how all of this could have happened."

At trial, the jury saw one minute of the video taken at Lake Charles Memorial Hospital during the state's direct examination of Dr. Saqer. The video showed movements to which Dr. Saqer referred as "posturing." A bandage on J.T.'s head covered multiple bruises on his face, left ear, and right temple.

Fifteen seconds of the one-minute video were also presented during the state's closing argument. The state's counsel asked the jury to render a verdict of first degree murder and commented, "And don't show him anymore [sic] sympathy or mercy than he did J.T."

The defendant, Jeffery P. Denby, was convicted by a jury of the first degree murder of an 18-month-old child, J.T., on May 21. He was sentenced to life in prison, without benefit of probation, parole, or suspension of sentence, on May 27, 2010. He argues on appeal that the trial court erred in allowing into evidence a one-minute video showing the child, close to death in the hospital, having seizures.

11

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR

The defendant argues that the trial court erred in admitting into evidence the video taken in the hospital, during the time the defense argues J. T. was having seizures. He further objects to its use by the state during closing argument to bolster the state's position that the jury should show the defendant no mercy.

Louisiana Code of Evidence Article 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

The Louisiana Supreme Court has set forth the standard for the use of gruesome photographs and videos at trial, holding that the issue of the admissibility of a video is similar to the issue of the admissibility of a photograph. A video, like a photograph , may be admitted into evidence to corroborate other testimony in a case such as the location of the body, the manner of death, the specific intent to kill, the number, location and severity of wounds, and the cause of death. *State v. Davis*, 92-1623 (La. 5/23/94), 637 So.2d 1012, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450 (1994).

"Generally, photographs are admissible in evidence when they are shown to have been accurately taken, to be a correct representation of the subject in controversy, and when they shed light upon the matter before the court." *State v. Strickland*, 398 So. 2d 1062, 1065 (La.1981).

The video at issue is a portion of a video taken at Lake Charles Memorial Hospital and was shown during the testimony of Dr. Saquer. The video depicts J.T. in the hospital bed with his head heavily bandaged. Bruises on his face and body are visible. The video depicts movements that are not seizures, as argued by the defense counsel, but in fact are movements referred to as "posturing." While certainly disturbing, they are neither overly gruesome nor unduly prejudicial. In addition to the video, the jury was shown seven photographs taken at Beauregard Memorial Hospital. These photographs were taken before J.T.'s brain surgery and before his head was bandaged. They graphically depict the location and extent of the bruises that the defendant inflicted. The defendant has not appealed the introduction into evidence of these photographs. The video which is the subject of this appeal is arguably less gruesome than the photographs. The trial judge limited the amount of the video displayed to the jury and disallowed the admission of the still photos taken with the video. The video accurately depicts J.T.'s injuries and "shed[s] light upon the matter before the court." *See Id.* We find no error in the trial court's determination that the video's probative value out weighed any prejudicial effect. This assignment of error is without merit.

## CONCLUSION

We find no error in the trial court's admission into evidence of the one-minute video from Lake Charles Memorial Hospital. The defendant's conviction is affirmed.

**AFFIRMED.**