NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-996


STATE OF LOUISIANA

VERSUS

BILLY RAY HARRIS


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 10540-13
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

**D. KENT SAVOIE**
**JUDGE**

**********

Court composed of Shannon J. Gremillion, Phyllis M. Keaty, and D. Kent Savoie, Judges.


**AFFIRMED.**

**John Foster DeRosier**
**District Attorney, Fourteenth Judicial District Court**
**Karen C. McLellan**
**Assistant District Attorney**
**Post Office Box 3206**
**Lake Charles, Louisiana  70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Billy Ray Harris**

**Billy Ray Harris**
**Post Office Box 2017**
**Lake Charles, Louisiana  70602**
**IN PROPER PERSON**

**SAVOIE, Judge.**

The State charged Defendant Billy Ray Harris by bill of indictment with the second degree murder of Raymona Lisa Gilmore between July 27, 2012, and July 29, 2012. A jury unanimously convicted Defendant as charged. Defendant was sentenced to serve life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant now appeals the conviction. For the following reasons, we affirm.

## FACTS

Defendant's ex-wife, Raymona Gilmore, with whom he was living at the time, was found dead at her home by the couple's daughter. While her body was found to have bruises and scrapes, her death was caused by head trauma she sustained. She also had a large amount of drugs in her system at the time of her death. The killer took the time to re-position her body on the couch to make it look like she was sleeping. The killer also covered her head to conceal the injuries. After an investigation, Defendant was charged with the murder of Raymona Gilmore and was ultimately found guilty.

## DISCUSSION

I.    *Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

II.    *Assignment of Error and Applicable Law*

Defendant contends the circumstantial evidence presented by the State was insufficient to convict him of second degree murder because the State failed to exclude the possibility that someone else murdered the victim.

In *State v. Crawford*, 14-2153, pp. 19-20 (La. 11/16/16), 218 So.3d 13, 26 (emphasis in original), the supreme court discussed the review of circumstantial evidence cases as follows:

> "[N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." **Jackson v. Virginia**, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A reviewing court, examining all of the evidence in the light most favorable to the prosecution, must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781; accord **State v. Brown**, 02-1922, p. 8 (La. 5/20/03), 846 So.2d 715, 721. In **State v. Davis**, 92-1623, p. 11 (La. 5/23/94), 637 So.2d 1012, 1020, a capital case, this court explained:
>
> > In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable doubt under **Jackson v. Virginia**[.]
>
> The **Jackson** standard does not permit this court to substitute its own appreciation of the facts for that of the factfinder. **State v. Robertson**, 96-1048, p. 1 (La. 10/4/96), 680 So.2d 1165, 1166. It is not the province of the reviewing court to assess the credibility of witnesses or reweigh evidence. **State v. Smith**, 94-3116, p. 2 (La. 10/16/95), 661 So.2d 442, 443. As explained in **State v. Mussall**, 523 So.2d 1305, 1310 (La. 1988):
>
> > If *rational* triers of fact could disagree as to the interpretation of the evidence, the *rational* trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus, *irrational* decisions to convict will be overturned, *rational* decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. [Footnote omitted.]

To convict Defendant of second degree murder under the State's theory of the case, the State had to prove Defendant killed Raymona Gilmore with the specific intent to kill or inflict great bodily harm in accordance with La.R.S. 14:30.1.

*III. Evidence Presented at Trial by the State*

While patrolling in north Lake Charles on Saturday, July 28, 2012, Deputy Christopher Miller, a patrolman with the Calcasieu Parish Sheriff's Office, observed a red Nissan Altima that had crashed into a trailer. Defendant was the driver of the Altima. Defendant told Deputy Miller that he was okay and that he did not need medical attention. Defendant explained that he did not know how the wreck happened, but that he had an argument earlier with his ex-wife, and he had moved out. In the back seat of the Altima was a television and a woman's purse. Deputy Miller also observed a pill bottle on the ground next to the car.

Because the wreck was inside the city limits, Officer Jacob Pearson of the Lake Charles Police Department was called to the scene at 7:20 a.m. Officer Pearson testified that Defendant spoke coherently, had a bit of a slur, but did not seem intoxicated or "un-normal" when he arrived. Officer Pearson collected a prescription narcotic (Alprazolam) that was in the name of Raymona Gilmore.[1] He also located a loose pill between the driver's seat and the door and another on the floorboard. Defendant was arrested for possession of narcotics and was taken to the police department and later to the Calcasieu Correctional Center, where his level of impairment prohibited his acceptance. The jail accepted him after he was taken to the hospital.

Some miscellaneous items were removed from the vehicle by Officer David Hampton, a patrol officer with the Lake Charles Police Department, including two wallets and some keys. The victim's driver's license was found amongst these items. Deputy Christopher Cormier of the Calcasieu Parish Sheriff's Office processed some of the crime scene as well as the vehicle. He identified the victim's empty

---

[1] The indictment indicates the victim's first name is "Raymona"; however, in the trial transcript her name is spelled "Ramona." We have used the spelling contained in the indictment.

3

prescription bottle of hydrocodone recovered from the passenger side seat of the car. The date on the bottle was July 27, 2012, and the prescription was for five 500 milligram pills. Recovered from the back seat of the car was a bag of clothing containing a pair of white socks, plaid shorts, one pair of blue underwear, one blue t-shirt, and one red USA ball cap. When the items were collected, they were damp, but there was nothing else in the car that was wet or damp.

Officer Pearson testified that he was concerned by the way Defendant discussed his ex-wife, which prompted him to request that a sheriff's deputy be dispatched to her home for a welfare check. The welfare check was performed on July 28, 2012, at approximately 8:07 a.m. by Dennis Miller of the Calcasieu Parish Sheriff's Office. Once at her mobile home, he knocked on each window and both doors but received no response. He walked completely around the home, and left after observing no forced entry or damage.

Chloe Harris, who is the daughter of the victim and Defendant, testified that, when she got off of work at 2 p.m. on July 29, 2012, she went to her great-grandmother's house and found out that her family had not spoken to her mother all weekend. At this point, Ms. Harris went to the victim's house to check on her. She looked through the window and noticed the living room 52-inch flat screen television was missing. Her mother's car was also gone, leading Ms. Harris to believe something was wrong. Because she did not have a key, Ms. Harris forced her way through the front door of the home with a credit card and by pulling on the bottom of the door. The bottom hinge was not attached to the frame of the door.[2] She noticed that her sister's room was a disaster. Her sister's television was missing, although the room was "fine" on Friday, two days prior. On the couch, she found

---

[2]On redirect examination, Ms. Harris testified that she recalled the front door working fine on Friday.

4

her mother's body covered by pillows and blankets. On cross-examination, Ms. Harris testified that her mother's head was "kind of in the corner of the couch" and there was blood "all over the place."

The last time Ms. Harris saw her mother was Friday morning, two days before finding her mother's body. According to Ms. Harris, her mother was "really sick" from thyroid problems thought by her doctor to be thyroid cancer. She was taking antibiotics for the thyroid issue and was also taking pain medication for problems with her teeth. On cross-examination, Ms. Harris testified that her mother was taking antibiotics, pain pills, anxiety medicine, and "something else for her throat." Later Friday night, after Ms. Harris got off work, she spoke to her mother on the telephone at around 10:30 or 11:00. This was the last time the two spoke. The next day, Ms. Harris' attempts to call and text her mother were unsuccessful.

Officer Dennis Miller, the officer who performed the welfare check, testified that on July 29, 2012, he was called out to the same location for a "possible disturbance." When he approached the victim's trailer, three or four people were outside yelling and screaming hysterically. Chloe Harris told him her mother was on the couch unresponsive, at which point he entered the house and located the victim's body. After clearing the home, he called paramedics, supervisors, and detectives. Officer Miller testified that the door was hanging sideways, but the day before, it had no signs of damage. He testified that Chloe told him she had forced her way into the home.

A medicine bottle containing seventy-four blue clindamycin pills was collected from the coffee table in the victim's living room, according to Lieutenant Jason Alexander of the Calcasieu Parish Sheriff's Office. The prescription was dated July 27, 2012, and was for 80 pills, two of which were to be taken four times daily. Lieutenant Alexander also took a swab of a rust-colored stain underneath the

5

washing machine lid. He noted there were seventeen washcloths and fourteen towels in the dryer. No blood was noticed on them. Melanie Hinton, an evidence custodian with the Calcasieu Parish Sheriff's Office, testified that she obtained a medicine bottle in the name of Raymona Gilmore recovered from a bag in the north bedroom containing three pills of "Hydrocodone, Acetaminophen, ten to six 50 milligrams" generic for Lorcet. This was prescribed on July 15, 2012, and the original quantity was ten.

Sylvia (Pat) Wynne, the victim's mother, testified that the victim had been bringing clothes for her to wash because the drainage in the trailer was not working properly. Ms. Wynne identified photographs of the shower and two tubs in the trailer that had "stuff that backed up into" them. On cross-examination, Ms. Wynne could not say how long the tubs had been backed up, but on redirect she said she had been helping her daughter wash clothes for about two weeks.

Thomas Vaughn testified that on July 27, 2012, he was the designated driver for Defendant, his brother, and some of his friends to hang out and go out that night. At approximately 10:20 or 10:30 p.m., Mr. Vaughn dropped Defendant off at home, and he was acting drunk. According to Mr. Vaughn, Defendant did not want to get out of the car, and he complained that his life was "messed up." Mr. Vaughn testified that the victim's car was there when he dropped Defendant off and that Defendant sat outside on an ice chest as he was driving away.

Elizabeth Miller met the victim several weeks prior to the incident. She testified that she stayed at her house for a couple of weeks. On Friday, July 27, 2012, the victim did not go to work, rather she ran errands and had a doctor's appointment. Ms. Miller stayed at the victim's house until about 3:00 or 4:00 p.m., at which point she left to go to DeQuincy. She later contacted the victim and Defendant to see if she could "go back early there." The victim responded via text

6

at 11:30 p.m. and said, "Just woke up, feeling really bad, hurting so bad." At 2:09 a.m. the following morning, Ms. Miller texted Defendant and asked if she could go to their house "tomorrow morning." At 2:49 a.m., he responded, "No." On cross-examination, Ms. Miller explained that this was unusual because she had been staying at the victim's home for two weeks, and she had never been told not to return. This was the last contact she had with them.

Ms. Miller also testified that she spoke to Defendant after he was incarcerated. A recording of the phone call was introduced into evidence at trial. In the call, Defendant told Ms. Miller that he and the victim were going to stay in a hotel because sewerage had backed up in their bathtub. Defendant told her that the reason he told her in the text message that she could not come over was because he and the victim were leaving. He said the victim got a call to get some pills so he left to pick them up, which Defendant later took. He explained that he got "fucked up," "crashed," and "died"; had to have his stomach pumped; and had to be "revived." He told Ms. Miller he did not know what happened to the victim.

William Spees of the Calcasieu Parish Sheriff's Office testified that when he arrived on the scene, Chloe Harris told him that two televisions were missing from the home. Deputy Spees testified that the television removed from Holly's room had been ripped out of the wall. According to Deputy Spees, the televisions were recovered from the victim's vehicle after it was involved in the accident. He identified the smaller television as still having the part on the cable that screws into the back of the television. Neither the murder weapon, Defendant's cell phone, nor the victim's cell phone were ever located.

Deputy Spees interviewed Defendant on July 29, 2012. A number of interviews with Defendant were played for the jury, with this being the first. In the interview, Defendant said he was living with the victim because he had been laid

7

off, his unemployment ran out, and the victim had gotten sick. He was staying there to help her with the kids, but he intended to move out soon because he had been re-hired. They were only friends and stayed on opposite ends of the home. Defendant found out about the victim's death from his brother Jerad Harris. Defendant said his brother and his mother-in-law thought that the victim overdosed. He said the last time he saw the victim was when he was dropped off after drinking with friends. He could not recall the exact time because he was intoxicated. On Saturday, between noon and 1:00 p.m., Defendant left the house because the plumbing was messed up and sewerage would back up into the bathtubs when they washed clothes or flushed toilets. He said numerous times during the interview that he was confused about the days and times that things occurred and that his memory was fuzzy. He left to take a shower at Thomas' house and the victim was supposed to leave to shower somewhere else. Elizabeth was there during the day as well. He said he later overdosed and crashed the victim's car.

Defendant said the victim was taking Lorcet for a toothache and another medication for her nose. He said she "messes with a lot of people" to get her "stuff" and that she had a lot of people in and out of the house providing her drugs. She gave him the keys to her car, and he headed for the first store he could find that was open. When asked why he was picked up by police so far from the victim's trailer, he could not explain other than to say he did not know where he was going or what he was doing because he was "so fucked up." Defendant said he should have stayed at home with the victim because she would not have overdosed. The victim was lying on the couch smoking a cigarette when he left to go to the store. He explained that he stayed "messed up" the whole weekend. When asked what he was going to do with the televisions, Defendant said he did not know.

Deputy Spees was asked at trial about the information provided by Defendant in his statement. Defendant said in his statement that the victim would not allow him to take her vehicle any time he was under the influence or "too messed up" to drive. He could not recall where he was going when he wrecked because he was very intoxicated or under the influence of narcotics.

Deputy Spees also monitored Defendant's phone calls from the jail. These were played for the jury and entered into the record. The first call was recorded on July 29, 2012, and was between Defendant and his mother. She told Defendant that the victim was found with a pillow on top of her face and that it was being investigated as a homicide. Defendant told his mother that the victim loaned him the car because the victim was too "fucked up" to leave. He said the victim gave him pills, and he overdosed on them. When he woke up, he was told by a nurse they had to revive him. He said the victim always fought with people over pills, but he stayed out of her business. When his mother tried to think of who would have stolen the televisions out of the house, Defendant said he did not know, but maybe he took them because he was "fucked up" and may have planned to sell them for drugs. Defendant told his mother that he had not yet been questioned by authorities.

The second call with his mother was also from July 29, 2012. At this point, Defendant had spoken to authorities. He said the victim was passed out when he took the televisions, and he was going to pack all of his stuff and stay with a friend of Elizabeth's, but he did not make it. He told his mother that the house had been broken into many times with things having been taken. Detective Spees testified that just prior to this conversation between Defendant and his mother, Defendant told the authorities he did not know why the televisions were in the car; he could not remember anything about that.

9

In a third conversation on August 2, 2012, Defendant spoke to his cousin.[3] Defendant told his cousin that he tried to convince Raymona to stay in a hotel since they could not bathe at the trailer, but she did not want to go. She wanted to spend the money on pills instead. Defendant finally persuaded her to go to a hotel, but then she got a phone call or text message about "meeting a person down the road."

The prosecutor asked Deputy Spees if he found it interesting that the victim's body was covered up. Depute Spees testified that he learned in classes that when a body is covered up, that typically means that someone very close to that person committed the murder because they do not want to see what they have done. They also do not want whoever discovers the body to have "the shock of just walking in and seeing that."

Jason McWright, a detective with the Calcasieu Parish Sheriff's Office, interviewed Defendant on August 1, 2012. Detective McWright testified that Defendant said he was married to the victim for five years and had been divorced for eight. He had been staying with the victim for about four or five weeks. He was staying there with his girlfriend, Ashley Broussard, at first, but she was causing problems so he broke up with her, and the victim kicked her out. He said he and the victim were staying together for their kids, but they led separate lives. He could not remember if the last time he saw the victim was Friday or Saturday night, but he remembered talking to her while she was on the couch. They were watching television and taking pills, and he was drinking beer. Defendant said he left with Thomas Vaughan to shower at his house. Defendant recalled that they may have stopped by to visit the victim later that night with their friend Scotty, but they left again to go to a party at Kirk's house. Defendant did not get back home until the

_____

[3]Despite Detective Spees' testimony that this was a conversation between Defendant and his brother, during the conversation, Defendant asked his cousin to pray for Defendant's brother, Jared. Thus, it appears this conversation was with Defendant's cousin, not his brother.

next day, and he "believe[d] [he] spent the night there with her." He said no one else was there but he and the victim, and he woke up on the little couch in the living room. The victim was on the other couch. After the two woke up, they ate at approximately 1:00 or 2:00 p.m. and then talked. Defendant said he started drinking again, and he and the victim both got "messed up" on pills such as Xanax, Lortab, and Lorcets. Defendant said he drank a twelve or eighteen pack of beer.

In this interview, Defendant did not remember the car crash but remembered waking up at the hospital and then later waking up again face down in a jail cell. He also remembered that he and the victim talked about him going to the store and it being okay for him to drive her car. He thought this happened late Saturday, but he was not sure because he was taking pills and drinking.

Defendant told Detective McWright that he and the victim had previous threats on their lives, and people broke into their home. Defendant said his ex-girlfriend Ashley told him that there were people that were going to harm him.

Detective McWright asked Defendant about the things found in the car. Defendant said he had no idea how the televisions got into the car. Detective McWright told Defendant that when the deputy who came upon the scene of the wreck asked about the televisions in the back seat, Defendant told him that he and his "old lady" got in a fight and he was moving out. During the interview, Defendant denied that he and the victim got into a fight. Defendant affirmed during the interview that the victim would probably not allow him to walk out of the house with the televisions.

When asked who he thought might have killed the victim, Defendant said he thought it might have been friends of Ashley. Defendant stated that he did not recall anyone coming in the house while he was there, and he did not know how the victim was killed. He denied inflicting her injuries or being present when she was killed.

11

Defendant said the victim was not in the car with him, and he replied, "If she was with me in the car, she'd be dead. That's when I wrecked the car, right?" Detective McWright told Defendant police found him wrecked at 7:05 on Saturday morning, so he and the victim could not have awakened Saturday at 1:00 or 2:00 p.m., because he was already in the hospital by then. Defendant explained that he must have gotten his days mixed up.

During the interview, Detective McWright asked Defendant about the bag of freshly washed clothing in the back seat of the car, Defendant said he did not wash clothes at Thomas Vaughan's house, and it made "no sense" that the clothes were in the car. Defendant stated that they could have been someone else's clothing. He also could not explain why his ex-wife's empty pill bottle was on the ground outside of the car. Defendant said her wallet and purse could have been there because she leaves them on the seat from time to time. Detective McWright then told Defendant that his daughters stated their mother never let her purse out of her sight because, most of the time, it contained pills. They also said the victim never let Defendant drive her car. Defendant explained that the fact that he drove her car was a secret between the victim and him because the victim did not want her mother to know she allowed Defendant to drive her car. Defendant denied ever getting mad and striking the victim.

Detective David Doucette of the Calcasieu Parish Sheriff's Office interviewed Defendant on August 31, 2012. Defendant said in this statement that the only time he was allowed to use the victim's car was when he ran her errands. Detective Doucette told Defendant that the victim's father was the owner of the car, and the victim was the co-signer; therefore, the car was in her father's name. Defendant believed the victim's parents hated him. He said that the victim wanted someone in the house at all times because Defendant's ex-girlfriend, Ashley Broussard, went

into the trailer and stole all of Defendant's belongings after he broke up with her. Another time, he had to run some teenagers off when they came up to the trailer. According to Defendant, the victim's front door was broken. Defendant said on the day of the wreck, the victim sent him to pick up some pills. He could not recall the time, but he said he had been with her brother and "them" all day. Defendant claimed the victim wanted to ride with him, but she did not want to leave the house empty for fear of their things being stolen.

Detective Brent Young of the Calcasieu Parish Sheriff's Office testified that he obtained the victim's phone records, and they showed that, on July 27, 2012, at 8:02 p.m., the victim's phone received a call lasting 14 minutes and 33 seconds from James LeBleu at the Calcasieu Correctional Center, who was a friend of the victim. The last outgoing text message, to Elizabeth Miller, was at 11:30 p.m. on July 27, 2012, and the following morning there were incoming text messages with no responses.

Monica Quaal of the Southwest Louisiana Crime Lab testified that the swabs submitted to her all tested positive for blood; however, they were unable to get a DNA profile. These swabs were obtained from the laundry room wall below the light switch, from below the handle on the dryer door, and from under the washing machine lid.

Ashley Broussard, Defendant's ex-girlfriend, testified that they were together for five and one-half years. In 2012, Ms. Broussard lived with Defendant and the victim, but she moved out around June 24, 2012, when she "didn't want to be with [Defendant] anymore." Ms. Broussard testified that, on one occasion when she and Defendant went out for his birthday, she got upset because he asked the cab driver for drugs. Defendant grabbed her and dragged her into the hotel room where the two fought, he choked her, and she blacked out. When she awoke, she had "messed

[her] pants" and for an hour, he would not let her go to the bathroom to clean up. Another time, when the two were staying with a friend of Defendant, his friend told him that Ms. Broussard had been sneaking out to see the guy who lived next door. Although she denied the allegation, Defendant believed his friend and did not want her to leave her room for four days. In the meantime, Defendant and his friends were making drugs, and against her will, Defendant injected Ms. Broussard with methamphetamine. At that time, Ms. Broussard had never ingested methamphetamine or any other drug by needle. She further testified that she had scars on her hands from Defendant biting her when she was trying to remove his hands from her neck. On another occasion, Defendant sold her truck for crack cocaine.

On cross-examination, Ms. Broussard testified that a scar on her chest was caused by the two of them fighting while drinking, a fight during which they both hurt each other. Ms. Broussard testified that she left Defendant to change her life because she was tired of fighting.

Another ex-wife of Defendant, Stacy Veillon, who is also the victim's cousin, testified that, while they were married, Defendant stole her wallet and took her car to north Lake Charles in order to get drugs. Another time, he stole all of her jewelry and, when she went looking for him, she found him at a hotel room "spun out" on drugs. Ms. Veillon also found a recording of Defendant attempting to pawn her video recorder.

Ms. Veillon was asked about incidents of abuse at the hands of Defendant. She recalled one time he grabbed her by the throat, lifted her up, and threw her on the floor. She described another incident as follows:

> He had me lay in the bed and he was high and he had these -- when he would get messed up I always had these people, imaginary people, that I was cheating on him with and I had several of them in the

house at this particular time and I wasn't telling him where they were and he had - - I had a really big, thick, green cookie jar and he told me that I couldn't get out of the bed until I told him where they were because he would go find them and if I didn't tell him that he was going to beat me with the cookie jar and I kept saying -- I'm sorry. I kept saying no, there's nobody. You're -- you're -- there's nobody and he would get more rage and more rage. So at this point I'm like, "Well, there they go," and so on the side was my end table and I told him like there they went, like they ran out the window or something, you know, and he took my cookie jar and busted my end table up and told me, "I got 'em," and then went out to the kitchen and got a broom and came back and he was going to hit me with it and said, "I told you that you were lying to me this whole time." He just got done telling me that they went out and he was going to hit me with the broom, and I screamed, "Jesus," and he just like in mid air just stopped and then went outside in his underwear with the broom going up and down the road looking for these imaginary people.

Finally, there was an incident where Defendant choked Ms. Veillon, and she passed out. When she woke up, Defendant was crying and said, "Oh my God, I can't believe [t]hat. . . .you're alive, I thought I killed you."

Dr. Terry Welke, the Calcasieu Parish Coroner, who was accepted by the court as an expert in the field of forensic pathology, testified that he performed an autopsy on the victim around 1:00 p.m. on July 30, 2012. He observed bruises and scrapes on her arms and legs, but her major injuries were four or five blunt force injuries to her head as well as a "chop injury" from something like a hatchet or an ax. Dr. Welke felt that a hammer may have been used, and he confirmed that this was a violent attack. The trauma to the victim's head caused brain injuries that led to the victim's death. His opinion was that the victim's injuries occurred while she was lying on the couch and that her body was repositioned after being struck in the head multiple times, so that it would give the appearance that she was asleep. Dr. Welke saw no defensive wounds.

Drug testing done as part of the autopsy revealed that the victim had Alprazolam (Xanax), an anxiety medication, in her system. The amount she had was seven to ten times the normal therapeutic level prescribed by a physician.

Hydrocodone (Vicodin), a potent narcotic pain medication was also detected. The level of this drug was four times the upper end of the therapeutic level. Also found in her system was clindamycin, an antibiotic. Based on Dr. Welke's observations, he determined the time of death to be around midnight or 12:05 a.m. on July 28, 2012.

Jamie Harris, Defendant's sister, testified for the defense. On July 4, 2012, when she picked her brother up, she saw him "fiddling" with the door because the deadbolt could only be locked from the inside of the house and because someone had tried to break in. He was making sure no one could get in the house.[4]

About two weeks later, the victim called Ms. Harris. During the conversation, the victim told Ms. Harris that someone had tried to break in and that she felt safe with Defendant there. Ms. Harris visited the house at least once a month around that time, and she observed no discord in the home between the victim and Defendant.

In closing argument to the jury, the State explained its theory of the case. The State believes that the Defendant was dropped off by Thomas Vaughn on the evening of July 27, 2012, and he talked to Vaughn about how messed up life is. Rather than going inside the trailer, he sat outside and drank more before going inside. The victim was awake at 11:30 p.m. because she sent a message to Elizabeth Miller about how bad she was feeling. Defendant admitted in his statement to Detective McWright that he and the victim were the only two people in the house on Friday night and Saturday morning. Dr. Welke determined the victim's time of death to be midnight or 12:05 a.m. on July 28, 2012. At 2:49 a.m. that morning, Defendant told Elizabeth Miller in a text message that she could not come to the trailer. In a subsequent conversation between Defendant and Ms. Miller after his incarceration,

---

[4]On cross-examination, Ms. Harris testified that "there was only one lock you can lock from the outside."

he told her that she could not come over because he and the victim were about to leave to go to a motel.  Thus, he was at the victim's trailer at 2:49 a.m. that morning.  The State's theory was that Defendant used the time after the murder to reposition and cover the victim's body, clean up the crime scene, and wash clothes.  A substance testing positive for blood was found on the laundry room wall under the light switch, under the lid of the washing machine, and under the handle of the dryer door.  Sewerage was observed backed up in the bathtubs, which happened when clothes were washed. At 7:10 a.m. that morning, Defendant was found in the victim's wrecked car.  Defendant had a history of violence with his ex-wife and his ex-girlfriend.  Both Defendant's ex-wife and his ex-girlfriend had belongings taken from them by Defendant, which he then sold to purchase drugs.  As for intent to kill or inflict great bodily injury, the severity of the injuries inflicted on the victim established this element.

Considering the evidence presented at trial, in a light most favorable to the prosecution and giving deference to the jury's credibility determination, we conclude that the alternative hypothesis that someone else killed Ms. Gilmore is not sufficiently reasonable that a rational juror could not have found Defendant guilty beyond a reasonable doubt.

**DECREE**

Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.