STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-511

STATE OF LOUISIANA

VERSUS

JOHN JAMES EDMOND, JR.
A/K/A JOHNNY JAMES EDMOND, JR.
A/K/A JOHN EDMOND, JR.

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 18-K-1337-D
HONORABLE D. JASON MECHE, DISTRICT JUDGE

**********

JOHN E. CONERY
JUDGE

**********

Court composed of John E. Conery, Jonathan W. Perry, and J. Larry Vidrine,[1] Judges.

CONVICTION AND SENTENCE AFFIRMED.

---

[1] Honorable J. Larry Vidrine participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **John James Edmond, Jr.**


**Johnny James Edmond, Jr., Pro-se**
    **Louisiana State Penitentiary**
    **17544 Tunica Trace**
    **Angola, Louisiana 70712-3029**


**Chad Patrick Pitre**
**District Attorney**
**Ellis J. Daigle**
**Assistant District Attorney**
**27th Judicial District**
**Post Office Drawer 1968**
**Opelousas, Louisiana  70571**
**(337) 948-3041**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**CONERY, Judge.**

## FACTS AND PROCEDURAL HISTORY

On May 24, 2018, a Grand Jury indicted Defendant John Joseph[2] Edmond, Jr. with the first degree murder of Grace Noel, a person over the age of sixty-five (65), a violation of La.R.S. 14:30. Jury selection took place on April 20, 2021, with Defendant's trial scheduled to begin on Monday, April 27, 2021. On April 26, 2021, Defendant filed "Defendant's Motion for Mistrial," contending the State's use of hypotheticals during *voir dire* which placed the trial judge in the role of a criminal unfairly prejudiced Defendant and made it impossible for him to receive a fair trial.

On April 26, 2021, the trial court granted Defendant's request for a mistrial on the ground the State's hypotheticals had sought a prejudgment of facts because the hypotheticals mirrored the State's anticipated theory of the case regarding Ms. Noel's death. The State sought review of the trial court's ruling, and this court vacated the grant of a mistrial, as set forth fully below. *See State v. Edmond*, 21-266 (La.App. 3 Cir. 4/30/21) (an unpublished writ ruling), *writ denied*, 21-0630 (La. 5/8/21), 315 So.3d 854.

Following remand, the State's prosecution of Defendant's case continued, with trial beginning on May 12, 2021. On May 14, 2021, a unanimous jury found Defendant guilty as charged on one count of first degree murder. Defendant thereafter filed a motion entitled "Motion for Judgment of Acquittal[,] Motion for New Trial[,] and Motion for Arrest of Judgment" and argued the evidence was insufficient to support his conviction. Defendant also argued that the trial court

---

[2] The indictment names Defendant as both "John Joseph Edmond, Jr." and "John James Edmond, Jr." The trial court subsequently ordered the indictment amended to reflect Defendant's name as "Johnny James Edmond, Jr."

erred in denying his request to have the jury instructed that they could acquit Defendant so long as ten members agreed but that all twelve had to agree in order to convict.

On May 27, 2021, the trial court denied Defendant's post-trial motions. After Defendant waived sentencing delays, the trial court imposed the mandatory sentence of life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant did not file a motion to reconsider.

Defendant appeals.

## ASSIGNMENTS OF ERROR

I. The State failed to sufficiently prove that John Edmond was guilty of first-degree murder.

II. The State's use of hypotheticals in voir dire that mirrored the facts and theory of the case was improper. Furthermore, the State sought prejudgments of facts from jurors based on these hypotheticals, which violated the rule against asking for commitments of jurors in voir dire. Finally, the use of the sitting trial judge as the "alleged criminal" in these hypotheticals diminished and disrespected the authority of the court. The trial court did not abuse its discretion to declare a mistrial.

III. Alternatively, if the Court finds defense counsel's use of the State's hypothetical or lack of a contemporaneous objection are factors in upholding the writ-panel's decision, then counsel's performance was ineffective.

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we find no such errors.

2

*Assignment of Error 1 – Sufficiency of the Evidence*

By this assignment, Defendant contends the State failed to sufficiently prove he was guilty of first degree murder. In particular, Defendant argues the State did not exclude every reasonable hypothesis of innocence, particularly the possibility "that someone broke in after John left that night." We accordingly begin our analysis with a review of the evidence presented at trial.

The State's first witness was Officer Herbert Levier, a former shift supervisor and school resource officer with the Opelousas Police Department. Officer Levier testified that in March of 2018 he was assigned to "CAPS"[3] as a school resource officer. Although he could not remember the meaning of the acronym, he noted the school was an alternative school.

Officer Levier testified that he was approached at work on March 23, 2018, by Ms. Tiffainy Smith, a cafeteria worker at the school, who reported her co-worker, Ms. Grace Noel, had not reported for work, and that Ms. Noel always had been on time in the past. After conversing with Ms. Smith, Officer Levier began a welfare check on Ms. Noel. Officer Levier testified that he notified dispatch at 8:40 a.m. that he was leaving the school to check on Ms. Noel. He stated Ms. Smith accompanied him on the welfare check, sitting in the front passenger seat, and that they arrived at Ms. Noel's home at 8:53 a.m. Officer Levier testified that upon his arrival, none of the doors were open.

Officer Levier testified that when he approached the residence, he noticed that a shoestring had been used to tie the screen door to the main door. He stated he forced the screen door open and began to knock on the wooden main door,

---

[3] The acronym relates to the "Center for Academic Programs," the name of the St. Landry Parish alternative school, as reflected in the record.

which Defendant ultimately answered. Officer Levier identified Defendant in court as the individual who answered the door. According to Officer Levier, he informed Defendant he was an officer with the Opelousas Police Department and that he was there to check on Ms. Noel since she did not go to work that day. Officer Levier noted he was in uniform at the time. According to Officer Levier, Defendant at that point insisted that Ms. Noel was at work. After informing Defendant that he was assigned to the school as a resource officer and knew Ms. Noel was not at work, Officer Levier then requested permission to enter the residence and verify Ms. Noel was not there. Defendant allowed Officer Levier to enter the residence at that time.

Officer Levier testified that upon entering the residence, the living area was to his right, the kitchen area was to his left, and straight ahead was a blue blanket hanging in the doorway to the hallway. Upon walking through the blanket, Officer Levier saw straight into the bathroom, where Ms. Noel was lying fully clothed in the bathtub, with blood on her clothing, the tub, and the shower curtain. After ascertaining Ms. Noel was deceased, Officer Levier immediately detained Defendant as a suspect.

Officer Levier testified that he then contacted dispatch and requested the Investigative Division be sent out. Upon the arrival of Sergeant Katina Guilbeau, Defendant was placed in the rear of Sergeant Guilbeau's patrol car. Officer Levier testified that Sergeant Brandon Harris of the Investigative Division took over the investigation.

Officer Levier noted on cross-examination that he works part-time as a patrol officer in Westlake while working primarily at the Office of Juvenile Justice Service in Lake Charles. He testified that at the time of Ms. Noel's death, he had

eighteen years of experience in law enforcement, including three years in the Investigative Division of the Opelousas Police Department. Officer Levier acknowledged the area where Ms. Noel lived, commonly called "The Hill," was an area of high crime. He also acknowledged that he did not know who attached the shoestring to the screen door.

The State then called Ms. Tiffainy Smith as a witness, who appeared via ZOOM over Defendant's objection. Ms. Smith testified that although she is currently an independent insurance claims adjuster, she was a nutrition manager for the St. Landry Parish School Board Systems in March of 2018. She noted that she was assigned to work at CAPS at that time. Ms. Smith noted that on March 23, 2018, Ms. Noel was scheduled to work at CAPS but was not there. Describing Ms. Noel as "a very sweet, loving, bubbly, energetic person that made my day every day," Ms. Smith stated that Ms. Noel was always on time for work.

Ms. Smith testified that she went to Ms. Noel's home about 6:45 a.m., blew her horn multiple times, and waited for about five minutes, but no one ever came to the door. She then drove back to the school. Ms. Smith testified that after breakfast, she spoke with Officer Levier and they went to check on Ms. Noel. Ms. Smith corroborated Officer Levier's testimony that he drove his car to Ms. Noel's residence while Ms. Smith rode in the front passenger seat. She testified that when Officer Levier knocked on the door, a man answered, which surprised her since no one answered when she had been there previously and had repeatedly blown her car's horn. Ms. Smith testified that Officer Levier entered the home then exited with the man who had answered the door. The man (Defendant Edmond) had been placed in handcuffs by Officer Levier. Ms. Smith also testified that she heard the

5

individual who answered the door (Defendant Edmond) tell Officer Levier that Ms. Noel "had been left to go to work."

The State then called Sergeant Brandon Harris of the Opelousas Police Department. Sergeant Harris noted that on March 23, 2018, he was working as a homicide detective and was dispatched to 731 St. Cyr Street, Ms. Noel's residence. He identified the area as a neighborhood called "The Hill." Sergeant Harris testified he walked the perimeter of the residence when he arrived and found no signs of forced entry. Among the photographs Sergeant Harris took at the residence was State's Exhibit 13, which showed where the string tied to the front screen door had been attached to the door frame to keep the door closed.

Sergeant Harris testified that when Acadian Ambulance arrived on the scene, Ms. Noel had no signs of life. Sergeant Harris attended the autopsy of Ms. Noel, and recalled she had blunt force trauma injuries, including two broken fingers on her left hand and a broken jaw, along with lacerations and injuries to her face and head.

The State's next witness was Mr. Mark Dupont, a registered paramedic who worked as an investigator for the Coroner's Office. Mr. Dupont was dispatched to Ms. Noel's residence at 731 St. Cyr Street on March 23, 2018, in response to a suspicious death at the residence. He noted that he was dispatched to the residence at 9:08 a.m. and that Ms. Noel was in a bathtub. Mr. Dupont noted that the multiple blunt force trauma injuries she suffered indicated Ms. Noel's death was a homicide.

Going through the injuries to Ms. Noel, Mr. Dupont noted an injury to her left temporal region, an open wound on her right forehead, and bruising and lacerations to her chin. Mr. Dupont noted Ms. Noel's body was sent to the

Louisiana Forensic Center, where Dr. Christopher Tape conducted the autopsy. The coroner, Dr. Russell Pavich, subsequently issued a death certificate which was introduced into evidence and showed Ms. Noel was seventy years old at the time of her death. The death certificate also indicated Ms. Noel died "as a result of traumatic brain injury with blunt force trauma to the head due to assault."

The State then called Dr. Tape, a forensic pathologist for the Louisiana Forensic Center. The court accepted Dr. Tape as an expert in forensic pathology. Dr. Tape confirmed Ms. Noel's cause of death was a "traumatic brain injury due to blunt force injuries to the head due to assault," and classified her death as a homicide. Dr. Tape stated the swelling around Ms. Noel's eye was consistent with being punched in the face near her eye. He also stated that Ms. Noel's left hand was swollen, and the middle finger and pinky were fractured. He noted lacerations to Ms. Noel's right forehead and underneath her right ear, as well as a fractured jaw.

Dr. Tape testified that during the autopsy, he found a basal skull fracture, noting there were depressions on either side of the temporal bone. He could not say if they were caused by a single injury or separate injuries.

The State then recalled Sergeant Brandon Harris. Sergeant Harris testified that his investigation found that the last time anyone had seen Ms. Noel alive was between 10:00 p.m. and 11:30 p.m. on March 22, 2018. He noted he spoke with multiple witnesses who were at Ms. Noel's residence the night before her death playing cards. Sergeant Harris testified there was no evidence Ms. Noel had a conflict with any of the three individuals who were at her residence the night before she died. He also noted a red and black hammer was located on the living

room sofa wrapped in a red towel. He explained the hammer and towel were collected because there appeared to be dried blood on both.

Sergeant Harris indicated Defendant was informed of his rights, waived them, and agreed to speak with him without an attorney present. At that point, the State played a recording of part of Sergeant Harris's interview with Defendant, which was filed as State's Exhibit 35.

During the interview, around the 8:30 mark, Sergeant Harris advised Defendant of his rights, and Defendant agreed to speak with Sergeant Harris regarding the death of Ms. Noel. Defendant informed Sergeant Harris that he and Ms. Noel were dating. Defendant described their relationship as "nice, real nice." Defendant stated they were "about to take the next step" but did not clarify exactly what that meant. Defendant stated he got to Ms. Noel's house at about 7:30 a.m. on March 23, 2018. He also stated that he entered through the back door of the home. Defendant stated that after turning on the TV and drinking some coffee, he went to the bathroom and found Ms. Noel in the bathtub. He stated he did not know what to do. When asked if he touched her, Defendant answered in the affirmative.

Defendant acknowledged that when Officer Levier arrived at the house, he asked where Ms. Noel was, to which Defendant responded he had just arrived. When asked why he did not tell Officer Levier about Ms. Noel, Defendant gave an unintelligible but evasive answer. He stated that when he saw Ms. Noel, he shook her and tried to wake her up, claiming she was "still soft," like her death had just happened. Defendant told Sergeant Harris the last time he saw Ms. Noel was the night before while playing cards. At that point, Defendant informed Sergeant

8

Harris that three other people were at the home playing cards. Defendant stated he left the house around 11:30 p.m.

Defendant told Sergeant Harris that no one was arguing the night before but that everyone was drinking wine, and one woman may have had gin. Defendant stated that he did not spend the night at Ms. Noel's because she had company so he left. He mentioned an ex-boyfriend of Ms. Noel, someone named Lawrence, but then noted the last time she spoke of Lawrence, he was in Dallas. Defendant claimed there was only five minutes between the time he arrived at the house on March 23, 2018, and when Officer Levier arrived at the door looking for Ms. Noel. Defendant informed Sergeant Harris that he had pulled the victim to himself, essentially in a hug, but that he did not notice any blood when he did so. Sergeant Harris then proceeded to take pictures of Defendant, his hands, and his clothing. Sergeant Harris then left Defendant alone in the room for over ten minutes.

When Sergeant Harris returned to the room, he mentioned that Officer Levier relayed that Defendant had told him he had walked Ms. Noel to work. Defendant denied it, stating that although he normally walked her to work, he had not done so that day because he had just arrived at the house. The video ends as Sergeant Harris is asking Defendant if he has ever been arrested; no answer is recorded on the video.

The State then resumed its direct examination of Sergeant Harris. He testified that Defendant confirmed to him that Defendant was in the home when Officer Levier arrived. He noted he found it strange that Defendant did not inform Officer Levier that Ms. Noel was in the residence and needed medical attention. Sergeant Harris subsequently confirmed that Defendant never answered the question of why he did not tell law enforcement that Ms. Noel needed medical

9

attention. Sergeant Harris identified the photographs he took of Defendant during the interview, noting that he spotted dried blood on Defendant's pants. Sergeant Harris's direct examination ended after he confirmed the investigation found no evidence to suggest that Joseph Papillion, Lisa Thomas, or Marcella Guidry, the three people playing cards with Ms. Noel on March 22, 2018, had killed her.

On cross-examination, Sergeant Harris acknowledged that Ms. Noel lived in a dangerous area and that her prior roommate was murdered in "The Hill" area. Sergeant Harris also acknowledged that Ms. Noel's daughter, Rosalyn Finger, had informed him that Ms. Noel had a .38 pistol, which was missing from the home after March 23, 2018. He also confirmed that Defendant stated in the interview that he left before the other people who were playing cards. According to Sergeant Harris, although Defendant identified Mr. Papillion and Ms. Guidry as having been at Ms. Noel's house on March 22, 2018, he was unable to locate and speak with them until roughly two weeks after Ms. Noel's death. He acknowledged that neither of them contacted law enforcement to report that they had seen Ms. Noel on March 22. He spoke with Lisa Thomas for the first time on April 17, 2018. When asked about forced entry, Sergeant Harris noted the side door, like the front door, was tied shut with a string wrapped around a nail.

The State and defense counsel then entered a stipulation that Ms. Lillie Nimer, one of Ms. Noel's neighbors, would have testified that Ms. Noel and Defendant walked their dog every morning; however, no one walked the dog on the morning of March 23, 2018. Additionally, Ms. Nimer did not hear anything out of the ordinary on the morning of March 23, 2018.

The State then called Mr. Jeremy Dubois, a forensic chemist with the Acadiana Crime Lab ("ACL"). Mr. Dubois was accepted by the court as an expert

10

in forensic science and forensic DNA analysis. He testified no seminal fluid was found on the sexual assault kit. He also noted they did not conduct any analysis of the fingernail clippings that were submitted. Mr. Dubois testified the wine glass submitted to the ACL had a mixed DNA profile, Ms. Noel was the major contributor, and Defendant, along with the three other people who were playing cards, were excluded as possible minor contributors. He testified the square drinking glass submitted also had a mixed DNA profile, noting Defendant was the major contributor. For the third glass submitted, Mr. Dubois testified there was again a mixed DNA profile, with Defendant as the major contributor and at least two minor contributors.

Mr. Dubois testified there was no blood on the grey and black hammer found in the bedroom. There was, however, blood found on both the red and black hammer and the red towel within which it was wrapped. He noted no blood was found on the head of the hammer but was found on the handle instead. Mr. Dubois noted that if the head of the hammer was cleaned well, it would be likely that blood would seep into the crevasses of the handle despite not being on the head of the hammer. Noting there was a mixed DNA profile, Mr. Dubois testified Ms. Noel was the major contributor. Although Ms. Guidry, Mr. Papillion, and Ms. Thomas were excluded as possible minor contributors, Defendant could not be excluded, and the sample was sent for a "TrueAllele analysis.[4]" According to Mr. Dubois, the same results were obtained from the red towel, namely there was a mixed profile with Ms. Noel as the major contributor, and Defendant was not excluded.

---

[4] TrueAllele analysis is a computer program that is capable of taking a mixed DNA profile and splitting it into individual contributors, as more fully explained in the testimony of the State's witness, Ms. Clair Guidry.

With regard to the denim jeans Defendant was wearing when he was interviewed by Sergeant Harris, Mr. Dubois testified the blood stains were a mixed profile with Ms. Noel as the major contributor, indicating the blood was hers. Mr. Dubois noted blood stains found on Defendant's sweater and the back of his jeans were single DNA profiles and the blood belonged to Ms. Noel.

On cross-examination, Mr. Dubois acknowledged that he cannot know when DNA was left on an item. He also acknowledged that it is possible for someone's DNA to be on an item without that person actually touching it.

The State then called Ms. Clair Guidry, whom the court accepted as a forensic scientist "in the area of DNA analysis" and "an expert in the TrueAllele Case Management System." She testified that the TrueAllele program was a computer software system that takes a mixed DNA profile and splits it into individual contributor profiles, which can then be tested against known samples. She testified that a match between Defendant and the second DNA profile on the handle of the hammer was 680 times more likely than a coincidental match to an unrelated individual. She stated the system could reach no conclusion as to whether Defendant was a minor contributor to the mixed profile found in the crease, as the DNA sample was not large enough to reach a conclusion.

The State's next witness was Ms. Marcella Guidry, one of the individuals who played cards with Ms. Noel on March 22, 2018. Ms. Guidry testified she and Ms. Noel were friends for about three and a half years, that they would visit each other in their homes, and that they would sometimes go places together. On March 22, 2018, Ms. Guidry stated Ms. Noel called her around 1:30 to 2:00 p.m. and wanted to get a gift from the casino. Ms. Guidry stated her cousin, Bernella Papillion, went to the casino with her and Ms. Noel. She also stated Defendant

12

went to the casino with them. She testified they stopped at Defendant's father's home so that Defendant could retrieve some money from the home. Ms. Guidry believed they spent about an hour at the casino, noting Ms. Noel was still wearing the clothes that she normally wore to work. Ms. Guidry testified that none of them won at the casino and that she brought Ms. Noel and Defendant back to Ms. Noel's house after they left.

According to Ms. Guidry, she and Ms. Noel had made plans at the casino to get back together later that day. She testified her brother, Joseph Papillion, and his girlfriend, Lisa Thomas, also came to the gathering at Ms. Noel's home. She noted Ms. Noel was happy to have everyone present. She testified the four of them played cards after watching TV and talking and that Ms. Noel, Mr. Papillion, and Ms. Thomas all had some wine. According to Ms. Guidry, Defendant asked for some wine, but Ms. Noel told him the guests come first, which upset him a little. She testified Defendant went to the bedroom and was there for at least an hour. Ms. Guidry testified Defendant returned to the living room about an hour before everyone left, noting things seemed okay and that plans had been made to meet at Ms. Guidry's house the following day for a fish fry. According to Ms. Guidry, her son picked her up about 10:00 p.m. at Ms. Noel's house, along with Mr. Papillion, and Ms. Thomas. Defendant was still at the house when they left. Ms. Guidry testified that when they got back to her house about fifteen minutes later, she called Ms. Noel and Defendant answered the phone and told her Ms. Noel was sleeping. According to Ms. Guidry, this was the first time Defendant had ever answered Ms. Noel's phone.

On Cross examination, after highlighting the discrepancy between Ms. Guidry's initial statement to Sergeant Harris that she knew Ms. Noel for nine

13

months and her trial testimony that she knew Ms. Noel for over three years, defense counsel questioned Ms. Guidry about her failure to contact law enforcement to inform them she had been with Ms. Noel the night before her death. Ms. Guidry responded that she knew "somebody was going to come."

The State then called Mr. Harry Meuillon, who worked at CAPS as a custodian in March of 2018. He testified that on March 22, 2018, he saw a man come up to the school to visit Ms. Noel. He could not, however, identify the man who came to the school as Defendant.

The State then recalled Sergeant Harris once more. He testified he interviewed Mr. Meuillon and wrote down Mr. Meuillon's statement as he was speaking with him. He noted Mr. Meuillon had trouble reading and writing, so he had to write the statement for him.[5] Sergeant Harris testified that he believed Defendant was the culprit when he arrested him on March 23, 2018, based on Defendant's failure to attempt to render aid to Ms. Noel and his subsequent decision to lie to Officer Levier about Ms. Noel's location. Sergeant Harris stated that everything he learned in his investigation solidified his opinion that Defendant murdered Ms. Noel.

On cross-examination, defense counsel questioned why Sergeant Harris had never before mentioned that the side door had been tied shut the same way the front door was and why it took nearly two weeks to get in contact with Ms. Guidry and Mr. Papillion. Sergeant Harris also confirmed that keys were taken from Defendant's person when he was arrested. Sergeant Harris confirmed the coroner's office, namely Mr. Dupont, arrived at the scene at 10:55 a.m.; therefore,

---

[5] Mr. Meuillon's statement taken by Sergeant Harris was not filed into evidence or published to the jury.

his estimate that Ms. Noel had been dead about ten hours would have put her time of death around 12:30 a.m. to 1:00 a.m. Sergeant Harris testified that on the day he interviewed Ms. Guidry, he visually inspected her phone and confirmed that a call had been made from Ms. Guidry's phone to Ms. Noel's phone, which was answered, on March 22, 2018. However, Sergeant Harris could not remember the exact time or duration of the cellphone call.

The State then called Ms. Noel's daughter, Ms. Roslyn Finger. She testified that her mother was always employed, noting she previously worked for Judge Rubin as a secretary. She also worked as an administrator for a "very large tobacco company" before working at the school. Ms. Finger testified that although she discussed a .380 caliber weapon with Sergeant Harris, she was not actually aware of her mother owning a firearm; rather, a friend had told her there might be a weapon in the house. According to Ms. Finger, she spoke to Ms. Noel around 8:00 p.m. on March 22, 2018, noting people were at the house and that she had also spoken to Ms. Guidry. Ms. Finger testified that her daughter informed her Ms. Noel was dead in the afternoon of March 23, 2018.

After the State rested its case-in-chief, defense counsel called Mr. Joseph Papillion to the stand. Mr. Papillon testified that on March 22, 2018, he was at Ms. Noel's house, watching TV, playing cards, and drinking a little wine. Mr. Papillion confirmed Ms. Guidry's son, Isiah, had dropped Mr. Papillion, Ms. Guidry, and Lisa Thomas at Ms. Noel's house. He testified they all left together around 10:00 p.m., at which time Ms. Noel and Defendant, known to Mr. Papillion as "Chicken," were in the house. According to Mr. Papillion, Ms. Noel poured glasses of wine for the guests first, which angered Defendant who retreated to the bedroom until right before everyone left. Mr. Papillion testified that it was Lisa

15

Thomas's daughter who informed them all the following day that Ms. Noel was dead. Defense counsel then ran through Mr. Papillion's lengthy criminal history. Defense counsel then rested his case, and a joint stipulation was entered that Ms. Lisa Thomas was subpoenaed but was physically unable to attend trial as she had been transferred to a residential nursing home.

The jury ultimately returned a unanimous verdict of guilty as charged of the first degree murder of Ms. Grace Noel, an individual over the age of sixty-five.

We now turn to the pertinent analysis for insufficient-evidence claims, which is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As noted by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04–1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is

left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

In the instant case, there was no witness with first-hand knowledge of how Ms. Noel was killed. Accordingly, the State was required to prove Defendant was responsible via other evidence. In particular, the State presented evidence that Defendant had access to the house, was in the house with Ms. Noel's blood on his clothes when she was discovered by law enforcement, lied about where Ms. Noel was when law enforcement initially came looking for her after he failed to report that he had found her dead in the bathtub, a hammer covered in Ms. Noel's blood was wrapped in a towel sitting in the living room, there were no signs of forced entry into the home, and witnesses saw Defendant angry with Ms. Noel the night before her body was discovered. Defense counsel argued that being slighted over who Ms. Noel served wine to first,

> [I]s a very thin motive to murder. The rest of the State's case was built on circumstantial evidence. It did not exclude every reasonable hypothesis of innocence, including that someone broke in after John left that night. [Ms. Noel] lived in a high-crime area that was dangerous enough for her to have a gun in the house--one that was never found.

The supreme court has previously noted that in order to convict an offender under La.R.S. 14:30, first degree murder, "the state must prove one of the enumerated circumstances in addition to specific intent to kill or to inflict great bodily harm." *State v. Thomas*, 427 So.2d 428, 432 (La.1982). Under La.R.S. 14:30(A)(5), one such circumstance is "[w]hen the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older." At trial, Ms. Noel's daughter testified that Ms. Noel was born on January 24, 1948, and was seventy years old at the time of her death.

17

Motive is not an element of the crime. Why Defendant chose to bludgeon his girlfriend to death is of no consequence so long as the State can prove Defendant killed her with specific intent to kill or to inflict great bodily harm. Furthermore, while Defendant contends Ms. Noel had a gun in her house that was stolen, there is no actual evidence to support this claim. At trial, Ms. Finger testified that she had no knowledge of her mother actually owning a firearm, only that a friend had suggested Ms. Noel may have had a gun, which information Ms. Finger relayed to Sergeant Harris.

Under La.R.S. 15:438, "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The Louisiana Supreme Court has previously noted:

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. Davis*, 92-1623, p. 11 (La. 5/23/94), 637 So.2d 1012, 1020, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450 (1994).

As previously noted by the supreme court:

> [I]n cases relying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of the defendant's guilt beyond a reasonable doubt.

*State v. Pigford*, 05-0477, p. 6 (La. 2/22/06), 922 So.2d 517, 521.

18

The only hypothesis of innocence actually advanced by Defendant on appeal is the same hypothesis offered at trial, that someone else broke into the house and killed Ms. Noel. Given the unanimous guilty verdict returned in this case, the jury clearly rejected this hypothesis, leaving this court to evaluate only whether the jury's rejection was reasonable. We find that it was.

Sergeant Harris testified repeatedly that when he examined the crime scene, there were no signs of forced entry anywhere at Ms. Noel's house. In fact, Sergeant Harris testified that both doors were tied shut with string from the inside, and that Defendant was the only person in the house. The body of Ms. Noel was in the bathtub, plainly visible by Officer Levier from the hallway.

While Defendant insists it is suspicious that Sergeant Harris had never previously mentioned that the side door into the house was closed and fastened with a string like the front door, he presents no evidence to dispute Sergeant Harris's testimony. Defendant offers the possibility that he may have secured the door after arriving at the home, yet nothing in Defendant's statement to Sergeant Harris supports this claim, given his insistence that he had just arrived at the home and that he had not been there long before Officer Levier arrived.

Additionally, Defense counsel contends the forensic DNA evidence was "highly circumstantial. Defendant offered plausible reasons why his clothes had Ms. Noel's blood on them--he tried to hug and kiss her when he found her in the bathroom." Defendant did not testify, and the claim that he hugged and kissed Ms. Noel failed to account for the blood on the back of Defendant's jeans. Furthermore, Defendant offered no explanation for why he never called for help when he found Ms. Noel dead or why he lied to Officer Levier when the Officer first asked where Ms. Noel was. Sergeant Harris asked Defendant multiple times

why he told Officer Levier she was not there, and all he could say was that he had just got there. He neither denied that he told Officer Levier that Ms. Noel was not home, nor did he explain why he said it. Although there was some debate about whether Defendant said he had walked Ms. Noel to school or simply that she was not home, he never contested that he had lied to Officer Levier.

Notwithstanding Defendant's contention that the DNA analysis on the hammer was inconclusive as to whether his DNA was present, the fact remains that the hammer, wrapped in a bloody rag, was sitting out in the open on the living room sofa. When Defendant gave his initial statement to Sergeant Harris, Defendant stated that upon arrival at the home on March 23, 2018, he prepared either food or coffee for himself before watching television, decided he needed the bathroom, and then found Ms. Noel dead in the bathtub. At no point did he mention noticing a bloody rag wrapped around a hammer sitting on the sofa in the living room.

Given all the evidence, we affirm the jury's decision.

*Assignment of Error 2 - Mistrial*

In his second assignment of error, Defendant contends this court erred in reversing the mistrial granted by the trial court the day before trial was scheduled to commence based upon uncontested hypotheticals used in *voir dire* by both the State and defense counsel. *See Edmond*, 21-266 (La.App. 3 Cir. 4/30/21) (an unpublished writ ruling). This court issued the following ruling regarding the trial court's grant of a mistrial:

> **WRIT GRANTED AND MADE PEREMPTORY:** The State seeks review of the trial court's decision to grant a mistrial granted the day before trial began based upon alleged similarities between a hypothetical used by both sides during voir dire and the trial court's appreciation of the State's theory of the case. As a general rule, a trial

20

court's ruling on a mistrial will be upheld absent an abuse of discretion. *See State v. Crawford*, 95-1352 (La.App. 3 Cir. 4/3/96), 672 So.2d 197, *writ denied*, 96-1126 (La. 10/4/96), 679 So.2d 1379. As both sides used the hypothetical extensively, no one objected to or restricted the use of the hypothetical during voir dire, and the hypothetical did not contain actual evidence or facts which would be brought forth during trial, the trial court abused its discretion in granting a mistrial under La.Code Crim.P. art. 775(3). As such, the trial court's declaration of a mistrial is vacated and this case is remanded to the trial court for further proceedings.

*Id.*

This court declines to review the issue of the mistrial based upon the "law of the case" doctrine. Our esteemed brethren in the first circuit have previously noted:

> The law of the case doctrine embodies the rule that an appellate court ordinarily will not reconsider its own rulings on a subsequent appeal in the same case. The reasons for the law of the case doctrine are to avoid relitigation of the same issue; to promote consistency of result in the same litigation; and, to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. *Barringer v. Robertson*, 15-0698 (La. App. 1 Cir. 12/2/15), 216 So.3d 919, 924-25, *writ denied*, 16-0010 (La. 2/26/16), 187 So.3d 1004; *see Day v. Campbell-Grosjean Roofing & Sheet Metal Corp.*, 260 La. 325, 330, 256 So.2d 105, 107 (1971). The doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. *State v. Cox*, 11-0789 (La. App. 1 Cir. 5/23/12), 2012 WL 1900539 at 3 (unpublished), *writ denied*, 12-1675 (La. 2/22/13), 108 So.3d 763. The law of the case doctrine is not an inflexible law, thus appellate courts are not absolutely bound by it and may exercise discretion in its application. The doctrine is not applied in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur. Further, the doctrine applies only against those who were parties to the case when the earlier decision was rendered and who thus have had their day in court.

*State v. Chandler*, 17-0962, p. 4 (La.App. 1 Cir. 12/21/17), 240 So.3d 950, 952-53.

Defendant contends this panel should review the court's prior ruling because transcripts of *voir dire* and the motion for mistrial are now available for review; however, we note the State submitted audio recordings of these same hearings

21

which were fully reviewed by the writ panel of this court prior to their original ruling. Defendant contends this court should not apply the "law of the case" doctrine because "[t]his appeal offers the Court a more complete record to review in terms of the transcripts of the voir dire hearing, the hearing on the motion for mistrial, and the full proceedings at trial." However, the writ panel of this court was able to listen to voir dire in its entirety, as well as the motion for mistrial, prior to issuing its initial ruling. Furthermore, it would be improper for the court to review its prior ruling on a mistrial based on evidence that did not exist until a trial was held after the original ruling. Accordingly, we find that the "law of the case" doctrine applies in the instant case as to the writ panel's *voir dire* writ ruling. This court therefore finds this assignment of error urged by Defendant lacks merit.

*Assignment of Error 3 – Review of Mistrial*

In his final assignment of error, Defendant contends that if this court finds:

[T]hat the law of the case doctrine does not apply, that the objection was timely, and the full record shows the State's hypothetical tracked too closely to the facts of the case, but the issue is waived because defense counsel expounded on the hypothetical, then defense counsel was *per se* ineffective.

Having determined that the law of the case doctrine applies to the instant case, we find there is no merit to this assignment of error because it fails based upon the first prerequisite for evaluating the claim.

## CONCLUSION

Accordingly, based on the foregoing, Defendant's conviction and sentence are hereby affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**